UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| SEAFOOD EXPORTERS ASSOCIATION OF INDIA, *Plaintiff*, | |
| v. | Ct. No. 25-00031 |
| UNITED STATES, *Defendant*, | Non-Confidential Document |
| and | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, | |
| *Defendant-Intervenors*. | |

<u>PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS RULE 56.2
MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Henry D. Almond
J. David Park
Lynn M. Fischer Fox
Kang Woo Lee
Archana Rao P. Vasa
*Counsel to Seafood Exporters Association
of India, Plaintiff*

ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20001
PHONE: (202) 942-5646
EMAIL: Henry.Almond@arnoldporter.com

# **TABLE OF CONTENTS**

I.   Introduction and Summary of Argument ........................................... 1

II.  The Commission's Rejection of Domestic Supply Constraints as an "Irrelevant" Condition of Competition Was Unsupported by Substantial Evidence and Overlooks the Commission's Statutory Framework ....................................................................................... 2

   A.   Supply Constraints Are a Core Condition of Competition Under the Statute, Not Merely an Undefined Biological Limit .............. 5

   B.   Questionnaire Responses Regarding "Availability" Do Not Establish Elastic Supply and Do Not Support Treating Supply Constraints as Irrelevant ............................................................. 8

   C.   The Commission's POI-Specific Facts Do Not Negate Structural Supply Constraints ....................................................... 10

   D.   The Commission's Methodological Critiques of the ION Report Do Not Render Supply Constraints Irrelevant ............................ 15

   E.   The Commission's "No Magic Words" Defense Does Not Cure Its Omission of Structural Supply Constraints from the Statutory Analysis ...................................................................................... 18

III. The Commission's Volume Determination Is Contrary to Law Because It Did Not Evaluate Significance  in Context ................... 20

IV.  The Commission Did Not Provide a Reasoned Basis for Including Frozen Cooked Shrimp in the Domestic Like Product ................... 24

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Altx, Inc. v. United States*, 26 C.I.T. 709 (2002) ............................ 4, 22, 23

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ...................... 4

*Comm. for Fair Coke Trade v. United States*, 28 C.I.T. 1140 (2004) ....... 9

*Espana v. United States*, No. 21-00562, 2023 WL 8866562 (Ct. Int'l Trade Dec. 18, 2023) .............................................................. 24

*Hynix Semiconductor, Inc. v. United States*, 30 C.I.T. 1208 (2006) ....... 20

*In re Nuvasive, Inc.*, 842 F.3d 1376 (Fed. Cir. 2016) ................................ 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................................................................................. 3, 7

*Nippon Steel Corp. v. United States,* 19 C.I.T. 450 (1995) ...................... 25

*Nippon Steel Corp. v. United States*, 25 C.I.T. 1415 (2001) .................... 22

*OCP S.A. v. United States* 658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) . 4, 5, 25

*OCP S.A. v. United States*, No. 1:21-CV-00219 (SAV), 2025 WL 1837257 (Ct. Int'l Trade Apr. 22, 2025) ........................................... 21

*OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ............................................................................... 20, 21

*Tenaris Bay City, Inc. v. United States,* 789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) .................................................................. 21, 23

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ................ *passim*

*USX Corp. v. United States*, 11 C.I.T. 82, ( 1987) ............................ 21, 24

*Valeo N. Am., Inc. v. United States*, 404 F. Supp. 3d 1303 (Ct. Int'l Trade 2019) ........................................................................... 28

## Administrative Decisions

*Certain Frozen or Canned Warmwater Shrimp and Prawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1068, USITC Pub. 3672 (Feb.17, 2004) (Preliminary) ........ 27

*Certain Frozen or Canned Warmwater Shrimp and Pawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-68, USITC Pub. 3748 (Jan. 6, 2005) (Final*)* ............................... 28

## Statutes

19 U.S.C. § 1677(4)(A) ........................................................................... 9

19 U.S.C. § 1677(7)(B)(ii) ...................................................................... 4

19 U.S.C. § 1677(7)(C)(i) ................................................................. 20, 21

19 U.S.C. § 1677(7)(C)(iii) .......................................................... *passim*

19 U.S.C. § 1677(10) ............................................................................ 25

## GLOSSARY

| Acronym | Item |
|---------|------|
| SEAI | Seafood Exporters Association of India |
| POI | period of investigation |
| NOAA | National Oceanic and Atmospheric Administration |

I.    <u>Introduction and Summary of Argument</u>

As discussed in SEAI's opening brief and further discussed below, this court should remand the Commission's affirmative injury determination in these investigations on two grounds. First, the Commission inadequately addressed the fundamental supply constraints facing the U.S. domestic industry. As is well documented in the record and supported by substantial historical evidence, domestic shrimp landings cannot supply more than a sliver of U.S. consumption. The Commission's analysis deflected or outright ignored this feature of the U.S. market, which rendered the Commission's view of the conditions of competition and volume unsupported by substantial record evidence and contrary to law.

Second, the Commission's decision to treat cooked and raw frozen shrimp as a single like product was unsupported by substantial record evidence, as the record before the Commission established that there is a clear dividing line in terms of production and market perception and demand for the two products.

Nothing in Defendant's or Defendant-Intervenor's response briefs overcome these shortcomings in the Commission's analysis, and this

court should accordingly remand the Commission's affirmative injury determination for reconsideration.

II.    The Commission's Rejection of Domestic Supply Constraints as an "Irrelevant" Condition of Competition Was Unsupported by Substantial Evidence and Overlooks the Commission's Statutory Framework

As SEAI explained in its opening brief, domestic supply constraints are not a peripheral consideration, they are a defining condition of competition in the U.S. shrimp industry. Pl.Br. at 15-42. Record evidence, including statistical analysis prepared by ION Economics (the "ION Report"), demonstrates that domestic harvest volumes fluctuate within a narrow range historically and have no correlation to subject imports. Pl.Br. at 18-22; SEAI Prehearing Br., Appx044415-044925. SEAI's argument is not that shrimp are biologically unavailable in U.S. waters, nor that landings never vary. It is that domestic production is structurally inelastic and incapable of meaningfully expanding to meet the vast majority of U.S. demand, a market feature that must frame the Commission's injury analysis under 19 U.S.C. § 1677(7)(C)(iii).

The Commission and Defendant-Intervenors reframed this argument as one concerning the biological absence of shrimp or a fixed cap on shrimp supply. Def.Br. at 65-76; Def-Int.Br. at 19. Having recast SEAI's

position this narrowly, the Commission then dismissed the supply-constraint evidence as "irrelevant" to its impact analysis. Views, Appx001340. That is not a permissible weighing of competing evidence. It is a failure to address the argument actually presented.

The statute requires the Commission to evaluate injury "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). By acknowledging supply constraints as a condition of competition, yet treating their structural implications as irrelevant, the Commission removed a central market characteristic from its analysis. This is inconsistent with the Commission's obligation to consider the substance of record evidence, including all material aspects of the problem. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight"); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This Court has recently addressed a materially similar issue. In *OCP S.A. v. United States*, the Court remanded the Commission's injury determination because it failed to account for a structural supply gap

created by the domestic industry's inability to meet demand. The Court

held that import volumes "may not be significant if the imported

quantities fill demand that the domestic industry is unable to meet

'either because of incapability or lack of viability.'" 658 F. Supp. 3d

1297, 1320 (Ct. Int'l Trade 2023) (quoting *Altx, Inc. v. United States*, 26

C.I.T. 709 (2002), *aff'd Altx, Inc. v. United States*, 370 F.3d 1108 (Fed.

Cir. 2004)). The same structural reality is present here. By treating

domestic supply constraints as irrelevant, the Commission did not fully

consider the evidence or discharge is statutory obligations.

This error also impacts the Commission's causation analysis. The

Commission's brief frames supply constraints as a mere alternative

cause to injury. But structural supply constraints do not "cause" injury;

they define whether subject imports could have displaced domestic

production in the first place. By deeming supply constraints irrelevant,

the Commission avoided confronting whether its causation conclusion

presumes elasticity that the record does not support. *See* 19 U.S.C. §

1677(7)(B)(ii).

4

A.  Supply Constraints Are a Core Condition of Competition Under the Statute, Not Merely an Undefined Biological Limit

The statute requires the Commission to evaluate injury "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). The Commission acknowledges that this contextual inquiry governs its impact analysis. Def.Br. at 3. Supply constraints in the U.S. shrimp industry are precisely such a condition of competition. *OCP*, 658 F. Supp. 3d at 1320.

Domestic production depends overwhelmingly on wild-caught shrimp harvested from finite natural waters. Views, Appx001304. Domestic output is constrained by harvest volumes. That structural limitation, not merely the existence of "some biological limit," Def.Br. at 9, 67, is the primary condition of competition between imports and domestic supply.

The ION Report, relying on multiple public data sources (including decades of National Oceanic and Atmospheric Administration ("NOAA") landings data), showed that domestic harvest volumes fluctuate within a narrow historical band and do not expand in response to various

5

market variables. Pl.Br. at 18-22; SEAI Prehearing Br., Appx044416-044419.

The Commission and Defendant-Intervenors instead characterize SEAI's argument as asserting a fixed biological cap. Def.Br. at 70; Def-Int.Br. at 19. By reducing the argument to the existence of an "ultimate biological limit," the Commission avoided addressing the key question: whether domestic production can meaningfully expand to meet demand. That question, not the abstract existence of shrimp in coastal waters, is relevant to injury.

Throughout the POI, domestic production accounted for only a small fraction of apparent U.S. consumption. Views, Appx001308. Even assuming full utilization of reported Gulf landings, domestic output could not supply more than a small percentage of U.S. demand. SEAI Prehearing Br., Appx044343. The Commission did not dispute these figures or identify record evidence showing that domestic harvest volumes expand proportionally when market conditions improve.

Instead, the Commission treated supply constraints as a standalone argument and ultimately declared them "irrelevant" to its injury analysis. Views, Appx001340. That approach is inconsistent with

§ 1677(7)(C)(iii), which requires the Commission to evaluate injury within the actual conditions of competition. A condition of competition cannot be acknowledged and then removed from the analytical framework. If domestic production is incapable of expanding to meet more than a small fraction of U.S. demand, that reality necessarily informs both impact and causation. *See In re Nuvasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (noting that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (citing *State Farm*, 463 U.S. at 43).

This structural constraint also bears directly on causation. The Commission's injury determination presumes that subject imports displaced domestic production. But if domestic harvest volumes are not capable of expanding to meet demand, then imports cannot displace domestic output. Accordingly, the Commission's determination should be remanded to properly consider these fundamental supply constraints.

B. <u>Questionnaire Responses Regarding "Availability" Do Not Establish Elastic Supply and Do Not Support Treating Supply Constraints as Irrelevant</u>

The Commission relied heavily on questionnaire responses indicating that (1) a majority of processors reported that wild-caught shrimp availability did not constrain processing, and (2) over 90 percent of responding fishermen reported that live shrimp availability did not affect supply. Def.Br. at 8, 17; Views, Appx001305-001307. From those responses, the Commission inferred that no meaningful supply constraints existed and concluded that SEAI's supply constraint evidence was "irrelevant." Views, Appx001340.

However, the questionnaire asked whether availability constrained supply during the POI, not whether domestic production could expand sufficiently to meet additional demand. Final Staff Report, Appx001066. However, SEAI's argument is that domestic harvest volumes are structurally constrained and cannot expand proportionally in response to subject imports or demand. *See* Pl.Br. at 18-22; SEAI Prehearing Br., Appx044415-044436. Reporting that shrimp were available in the ocean does not establish that domestic production could expand to meet demand.

8

The statute requires the Commission to evaluate the condition of the domestic industry "as a whole." 19 U.S.C. § 1677(4)(A); *see also Comm. for Fair Coke Trade v. United States*, 28 C.I.T. 1140, 1166 (2004). In doing so, it must consider the record as a whole, including evidence that detracts from its conclusions. *See Universal Camera*, 340 U.S. at 488.

The record demonstrates increasing U.S. production to meet demand is not possible. Throughout the POI, domestic production never exceeded seven percent of U.S. apparent consumption. *See* Views, Appx001308, Final Staff Report, Appx001226. Even assuming full utilization of Gulf landings, domestic output could not supply more than a small percentage of U.S. demand. SEAI Prehearing Br. at Appx044343. The Commission did not reconcile that persistent structural gap with its conclusion that supply constraints were irrelevant. Instead, it treated generalized reporting about "availability" as dispositive evidence that domestic production could expand as needed, which record evidence has shown historically is not the case. This is not due to subject imports, but rather to structural supply constraints entirely unrelated to subject imports, as record evidence shows. *Id*. at Appx044419-044435. In short, the questionnaires

establish only that some shrimp remained in U.S. waters during the POI. They do not establish that domestic production was capable of expanding to meet more than a small fraction of U.S. demand.

### C. The Commission's POI-Specific Facts Do Not Negate Structural Supply Constraints

The Commission also relied on POI-specific observations to conclude that domestic supply constraints were "irrelevant." None of those observations addresses the heart of the issue. Notwithstanding evidence showing that U.S. harvest levels remained relatively constant over the years, the Commission reasoned that harvest levels during the POI were "largely dictated by the financial incentives for fishermen to harvest shrimp." Def.Br. at 68-69; *see also* Def-Int.Br. at 17. In support, the Commission cited testimony that fishermen reduced or abandoned fishing efforts because low dockside prices made harvesting economically unviable. Def.Br. at 69-70. This testimony does not negate SEAI's supply constraint arguments, nor does this merely involve assigning weight to evidence. The Commission entirely disregarded an important segment of evidence before it.

Elasticity requires evidence that domestic harvest volumes increase meaningfully in response to increased demand. The Commission cited

no record evidence demonstrating such responsiveness. Defendant-Intervenors cite prior shrimp determinations to support this finding; however, the Commission did not consider historical data similar to the ION Report in those proceedings. *See* Def-Int.Br. at 17-18. Moreover, prior Commission statements that low prices reduce harvesting incentives do not resolve whether domestic harvest volumes are structurally capable of expanding to displace imports.

Even if domestic landings correlated to dockside (i.e., ex-vessel) prices (which record evidence shows they do not, *see* SEAI Prehearing Br. at Appx044419; Appx044422-04432, contractions during periods of low prices does not establish that harvest volumes could expand meaningfully to supply higher demand. The question is not whether fishermen reduced effort during a period of low ex-vessel pricing. The question is whether domestic production is capable of meeting a substantially greater share of U.S. demand.

The Commission and Defendant-Intervenors argue that imports depressed dockside prices, reducing fishermen's incentive to harvest. Def.Br. at 68-70; Def-Int.Br. at 16-20. That argument addresses price pressure, not whether domestic harvest volumes could expand absent

imports, which is the relevant causation question. The Commission cited no record evidence demonstrating that domestic production historically expands in that manner. Absent such evidence, the Commission's "by reason of" conclusion is unsupported.

Second, the Commission cited anecdotal testimony that U.S. shrimp landings were "deeply depressed." Def.Br. at 69. As discussed above, decades of NOAA data show that Gulf landings have fluctuated within a narrow historical band and do not expand in response to market conditions. SEAI Prehearing Br., Appx044341; Pl.Br. at 19. Anecdotal statements cannot outweigh objective historical data showing structural limits on domestic supply.

The Commission also pointed to an increase in processors' inventories from 2021 to 2023, characterizing this increase as reflecting an "ability to sell more frozen shrimp." Def.Br. at 9; Views, Appx001341. Rising inventories reflect unsold production, not limitless supply. If domestic processors were capable of expanding output, inventory accumulation would not have occurred alongside market-share losses. SEAI Prehearing Br. at Appx044351. Moreover, total U.S. inventory of subject imports could have only supplied a mere 20 days of

U.S. demand even at the highest level of U.S. inventory during the POI.

*Id.* at Appx044363-044364.

Similarly, the Commission noted that apparent U.S. consumption declined from 2021 to 2023. Def.Br. at 15. That observation does not address structural supply constraints. Even during periods of higher demand (including the pandemic-driven demand spike in 2021) domestic production did not expand proportionally to close the gap between domestic supply and U.S. consumption. Views, Appx001328 ("U.S. shrimp demand remained strong throughout the POI and only appeared to decline due to particularly elevated demand in 2021 related to the COVID-19 pandemic, which is consistent with record evidence that apparent U.S. consumption was higher in 2023 than in 2020"); Final Staff Report, Appx001226-001228. The structural disparity between domestic production and total U.S. demand persisted throughout the POI. The Commission did not explain why that structural reality is irrelevant to its statutory impact analysis.

Finally, the Commission asserted that annual landings fluctuated by 20 to 30 percent in certain years, purportedly undermining SEAI's characterization of constrained supply. Def.Br. at 72-73. But these

fluctuations are small relative to U.S. demand, and year-to-year variability within a range does not establish ability to expand production. The ION Report does not claim that landings are constant; it demonstrates that harvest volumes fluctuate within a limited historical band, and are inherently constrained. SEAI Prehearing Br. at Appx044416.

The relevant inquiry is whether domestic harvest levels respond meaningfully to changes in subject import volumes or market conditions. The record evidence indicates they do not. The Commission identified no contradictory empirical evidence demonstrating that domestic production could increase sufficiently to fill the persistent gap between domestic supply and U.S. demand. Instead, it relied on selective POI-specific facts that do not address structural supply elasticity.

The Commission's POI-specific observations do not negate supply constraints established by decades of data, as shown in the ION Report. By treating those discrete facts as dispositive while disregarding broader structural evidence, the Commission failed to evaluate the record as a whole. *See Universal Camera*, 340 U.S. at 488. Its conclusion

that supply constraints were "irrelevant" is therefore unsupported by substantial evidence.

D. <u>The Commission's Methodological Critiques of the ION Report Do Not Render Supply Constraints Irrelevant</u>

The Commission and Defendant-Intervenors also attempt to undermine the ION Report by identifying methodological limitations that: (1) the analysis did not include complete South Atlantic landings data; (2) it relied on simple rather than multiple regression techniques; and (3) it focused on data beginning in 2012. Def.Br. at 71; Def-Int.Br. at 18-19. Even accepting those criticisms (which Plaintiff has shown do not undermine the ION Report's conclusions), they do not render the structural supply evidence irrelevant to the Commission's statutory analysis.

At the outset, SEAI addressed each of the Commission's methodological concerns and explained why they did not undermine the core conclusions of the ION analysis. Pl.Br. at 33-36. The ION Report relied on decades of publicly available NOAA Gulf landings data (the dominant source of domestic raw shrimp supply) and detailed its data sources and analytical framework. SEAI Prehearing Br., Appx044415-044436. The absence of complete South Atlantic data does not negate

the overwhelming share of Gulf landings in total U.S. harvest volumes, nor does it erase the historical pattern reflected in the Gulf data.

Nor does the use of simple regression analysis render the structural findings irrelevant. The ION Report demonstrated that domestic landings show no statistically significant relationship to both import volumes and ex-vessel prices. *Id*. The Commission criticized the absence of multiple regression controls, but it did not perform or identify any competing empirical analysis or articulate why a simple regression analysis was unreliable or inaccurate. Views, Appx001342-001343. An agency may disagree with the weight or sophistication of an expert analysis, but it may not dismiss structural evidence altogether without confronting its central premise.

The Commission also faulted the ION Report for focusing on a period beginning in 2012, asserting that this period reflected a market already characterized by substantial imports. *Id*. Yet, the Commission did not identify record evidence demonstrating why this was an issue, as it could not show that domestic landings were meaningfully more elastic before imports entered the market in significant quantities. Nor did it cite evidence that domestic production historically expanded to meet

demand growth. To the contrary, the historical data going back to 2006 show fluctuations within a constrained range over time. SEAI Prehearing Br., Appx044444; Appx044541-044925 (NOAA landings source data).

More fundamentally, even if the Court were to fully accept each methodological criticism, those critiques would go only to the weight of the econometric modeling. They would not render irrelevant the underlying historical landings data, the persistent gap between domestic production and U.S. consumption, or the evidence showing inelastic domestic supply.

The Commission conflated criticism of econometric technique with dismissal of structural evidence. Under *Universal Camera*, the Commission must consider the record as a whole, including evidence that detracts from its conclusions. 340 U.S. at 488. It may assign weight to competing evidence, but it may not deem probative structural data "irrelevant" simply because it disputes aspects of the methodology used to analyze that data.

The statutory inquiry requires the Commission to evaluate injury within the context of the industry's conditions of competition. 19 U.S.C.

§ 1677(7)(C)(iii). The ION analysis and the underlying NOAA landings data are directly probative of whether domestic supply is structurally elastic. Because the Commission failed to reconcile the structural evidence with its injury findings, and instead treated that evidence as irrelevant, its analysis cannot be sustained as supported by substantial evidence.

Nor do the Commission's methodological critiques address causation. Even if the Court were to discount the regression modeling, the underlying historical landings data and persistent supply gap remain. The Commission identified no empirical evidence showing that domestic harvest volumes expand in response to import penetration. Without such evidence, the Commission's conclusion that subject imports caused injury by displacing domestic production lacks substantial support.

   E. <u>The Commission's "No Magic Words" Defense Does Not Cure Its Omission of Structural Supply Constraints from the Statutory Analysis</u>

Finally, the Commission argues that it addressed supply constraints in its impact analysis and that there is no required "magic word analysis." Def.Br. at 72 (citing *Hynix Semiconductor, Inc. v. United States*, 30 C.I.T. 1208, 1219, (2006)). SEAI does not contend that the

Commission was obligated to employ specific terminology or adhere to a prescribed rhetorical format. The issue here is not linguistic. It is analytical.

The Commission acknowledged that "supply considerations" are a condition of competition. Views, Appx001304-001309. It further recognized that there is "some biological limit" to shrimp harvests. *Id.* at Appx001340. After acknowledging those constraints, the Commission deemed the supply-constraint evidence "irrelevant" to its impact analysis. *Id.* That treatment reflects not a difference in phrasing, but a separation of supply constraints from the substantive injury analysis.

The statute requires the Commission to evaluate injury within the context of conditions of competition that are distinctive to the affected industry. *See* 19 U.S.C. § 1677(7)(C)(iii). That statutory mandate requires more than identifying a market characteristic; it requires integrating that characteristic into the injury analysis. Here, although the Commission referenced supply constraints, it did not frame its statutory injury analysis within the full context of those structural limitations.

19

Excluding a central condition of competition from the analytical

framework is not a permissible weighing of competing evidence. It

reflects the omission of an important aspect of the problem. *Universal*

*Camera Corp. v. NLRB*, 340 U.S. at 488 (the agency must consider the

record as a whole).

As discussed above, if domestic production is fundamentally

incapable of expanding to meet more than a small fraction of U.S.

demand, that reality necessarily informs volume, impact, and

causation. By labeling that evidence "irrelevant" rather than

incorporating it into its statutory evaluation, the Commission's injury

determination cannot be sustained as supported by substantial

evidence.

III.    The Commission's Volume Determination Is Contrary to Law
        Because It Did Not Evaluate Significance  in Context

The Commission defends its volume determination on the grounds

that 19 U.S.C. § 1677(7)(C)(i) requires it to consider only whether

subject import volume is significant "in absolute terms" and "relative to

production or consumption," and that conditions of competition must be

addressed only in the Commission's impact analysis. Def.Br. at 38-44

(citing *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1299-1300

(Ct. Int'l Trade 2021); *Tenaris Bay City, Inc. v. United States,* 789 F. Supp. 3d 1352, 1373 (Ct. Int'l Trade 2025)). SEAI does not contend that the statute requires a separate "volume effects" analysis within the volume subsection.

The statute requires the Commission to determine whether import volume is "significant." 19 U.S.C. § 1677(7)(C)(i). As this Court has recognized, "it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis." *USX Corp. v. United States*, 11 C.I.T. 82, ( 1987). Significance is inherently contextual. It cannot be determined by reciting percentage figures without regard to undisputed structural features of the market. *See OCP S.A. v. United States*, No. 1:21-CV-00219 (SAV), 2025 WL 1837257, at *1 (Ct. Int'l Trade Apr. 22, 2025) ("{the Commission} must . . . apply its 'conditions of competition' findings to its analysis of the three statutory factors.").

Here, the Commission cites absolute volume, market share, and ratios to domestic production. Def.Br. at 39. It does not address the structural fact, established by record evidence, that domestic production is incapable of supplying more than a small fraction of U.S. demand,

even under full utilization of available U.S. Gulf landings. SEAI
Prehearing Br., Appx044343. If domestic output cannot meaningfully
expand, then the presence of large import volumes simply reflects a
persistent supply gap rather than an injurious displacement of domestic
production.

The Commission must assess "significance" in light of the actual
competitive structure of the market. *See Nippon Steel Corp. v. United
States*, 25 C.I.T. 1415, 1420 (2001) (finding that "for the Commission's
findings under section 1677(7)(C)(1) to be supported by substantial
evidence, the Commission must analyze the volume and market share
data in the context of conditions of competition"); *Altx, Inc.*, 26 C.I.T. at
719 (explaining that volume significance must account for product types
"practically unavailable from U.S. sources"); *OCP*, 658 F. Supp.at 1320
(finding that imported volumes may not be "significant" if they fill
demand the domestic industry is unable to meet).

The Commission did not undertake that contextual assessment.
Instead, it treated volume as inherently significant because imports
accounted for a large share of U.S. consumption. But where domestic
supply is structurally constrained, high import shares are the

22

predictable result of that constraint. Without addressing that structural reality, the Commission's determination that volume was "significant" is unsupported.

This Court's decision in *OCP* illustrates the point. There, the Court remanded the Commission's injury determination because the Commission did not adequately consider a structural supply gap created by the domestic industry's inability to meet demand, circumstances that are mirrored in the instant case. The Court held that imported volumes "may not be significant if the imported quantities fill demand that the domestic industry is unable to meet 'either because of incapability or lack of viability.'" *Id*. at 1320 (quoting *Altx, Inc.*, 26 C.I.T. 709 at 717). That holding did not rest on a textual expansion of conditions of competition analysis under 19 U.S.C. § 1677(7)(C)(iii). It rested on the principle that volume significance must be assessed in light of actual market structure. The same structural reality is present here: domestic production cannot meet more than a small fraction of U.S. demand. Without accounting for that constraint, the Commission's finding that subject import volume was "significant" is unsupported. Nothing in *Tenaris*, 789 F. Supp. 3d 1352

or *Espana v. United States*, No. 21-00562, 2023 WL 8866562 (Ct. Int'l Trade Dec. 18, 2023) suggests that the Commission may ignore undisputed structural features of the market when determining whether import volume is significant. Those cases address whether a separate "effects" inquiry is required in the volume subsection—not whether the Commission may disregard record evidence demonstrating that imports merely fill demand the domestic industry cannot meet.

Even accepting that the statute does not require the Commission to consider "effects" within the volume subsection, it does require a reasoned explanation tying the concept of "significance" to the market conditions reflected in the record. *See USX Corp.*, 11 C.I.T. at 84 ("it is the significance of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis"). Because the Commission did not reconcile the persistent structural supply gap with its finding of volume significance, its volume determination is not in accordance with law.

IV.    <u>The Commission Did Not Provide a Reasoned Basis for Including Frozen Cooked Shrimp in the Domestic Like Product</u>

The Commission's like-product determination cannot be sustained because, although it acknowledged significant distinctions between frozen cooked shrimp and frozen raw shrimp, it did not provide a

reasoned explanation for why those distinctions failed to establish a clear dividing line between frozen cooked shrimp and frozen raw shrimp.

Under 19 U.S.C. § 1677(10), the Commission must determine whether domestically produced products are "like, or in the absence of like, most similar in characteristics and uses" to the subject merchandise. The Commission evaluates this issue using its traditional six-factor analysis, looking for a "clear dividing line" between potential like products. Views, Appx001270 (citing *Nippon Steel Corp. v. United States,* 19 C.I.T. 450, 455 (1995)). The issue here is not whether some similarities exist between raw and cooked frozen shrimp. It is whether the Commission adequately explained why identified product differences were insufficient to warrant a separate like product.

The Commission emphasized that frozen cooked shrimp and frozen raw shrimp share similar physical characteristics, the same ultimate end use of "human consumption," and common initial processing steps. Views, Appx001278-001284; Def.Br. at 26-31; Def-Int.Br. at 8. SEAI does not dispute that both products are shrimp or that both are consumed as food. But the relevant inquiry is whether the record

demonstrated meaningful differences in production, interchangeability, and market function at the point of sale.

The Commission acknowledged that 15 of 20 responding purchasers reported that raw and cooked shrimp were "*never* interchangeable." Views, Appx001280; Def.Br. at 31 (emphasis added). Such evidence weighs heavily in a like-product analysis. Rather than look to this interchangeability data, the Commission relied primarily on retail displays and packaging examples showing that cooked and raw shrimp are sometimes sold side-by-side. Views, Appx001280-001282; Def-Int.Br. at 8-9. Similar (yet distinct) packaging and shelf placement do not negate key purchaser testimony that the products are not interchangeable. This retail display focus also misses the point because the purchases and point of competition is not the individual consumer at the store—the competition takes place at the wholesale and distributor level.

The Commission also acknowledged that producing cooked shrimp requires additional processing steps, specialized equipment, and compliance with distinct regulatory requirements, including FDA-related standards. Views, Appx001279-001282; Def.Br. at 29-30. Those

26

are significant differences that reflect a distinct production line and capital investment profile. Although the Commission recognized these differences, it did not meaningfully explain why they did not create a dividing line in manufacturing processes.

In response, the Commission and Defendant-Intervenors emphasize that the three U.S. producers of cooked shrimp also produce frozen raw shrimp, suggesting overlap of firms. Def.Br. at 30; Def.-Int.Br. at 5-7. However, firm overlap does not resolve the like-product inquiry. A single producer may manufacture multiple distinct like products. The relevant question is whether the products themselves are sufficiently distinct in characteristics, production processes, and market perception. The Commission did not explain why the existence of overlapping firms eliminates the significance of acknowledged production differences.

The Commission further relied on its 2004 investigations, where cooked shrimp was included within a broader like product, to support its conclusion here. Views, Appx001283 n.57; Def-Int.Br. at 5-6; *Certain Frozen or Canned Warmwater Shrimp and Prawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1068, USITC Pub. 3672 (Feb.17, 2004) (Preliminary) at 6-9; *Certain Frozen or*

*Canned Warmwater Shrimp and Pawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-68, USITC Pub. 3748 (Jan. 6, 2005) (Final). Prior determinations do not substitute for a record-specific analysis. Each like-product inquiry is fact-specific. *Valeo N. Am., Inc. v. United States*, 404 F. Supp. 3d 1303, 1308 (Ct. Int'l Trade 2019), *aff'd*, 823 F. App'x 937 (Fed. Cir. 2020). Moreover, the Commission's prior determination distinguishing canned shrimp demonstrates that additional processing, distinct equipment, and different market presentation can create a separate like product when the record supports it, even where there is a degree of overlap in processing in equipment. *Certain Frozen or Canned Warmwater Shrimp and Prawns,* USITC Pub. 3748 at 9-10. The Commission did not explain why the distinctions here were insufficient, particularly in the context of the prior investigations.

Finally, the ITC argues that SEAI merely seeks to reweigh the evidence. Def.Br. at 27-33. However, SEAI does not dispute that some similarities exist. The issue is whether the Commission provided a reasoned explanation connecting the record evidence to its conclusion that no dividing line exists. Where the Commission acknowledges

significant non-interchangeability, distinct equipment requirements, additional regulatory standards, and limited domestic cooked production, it must explain why those factors do not outweigh similarities. A recitation of overlapping characteristics is not a substitute for that explanation.

Because the Commission did not adequately explain why acknowledged distinctions failed to establish a clear dividing line between frozen cooked and frozen raw shrimp, remand is required.

## <u>CERTIFICATE OF COMPLIANCE WITH CHAMBER PROCEDURE<br>2(B)(1)</u>

Pursuant to this Court's Order dated December 22, 2025 (ECF No. 47), setting the word limitation of Plaintiff SEAI's Reply Brief to 5,000 words, counsel for Plaintiff certifies that the attached Reply Brief contains 4,983 words, including footnotes. The word count certification is made in reliance on the word-count function of the word-processing system used to prepared this brief. This brief therefore complies with the Court's Scheduling Order.

By:                                                            <u>/s/ Henry D. Almond</u>
                                                                   Henry D. Almond

**Date: March 9, 2026**

<u>CERTIFICATE OF COMPLIANCE WITH FEDERAL CIRCUIT RULE
25.1(e)(2)</u>

Pursuant to the Court's guidelines regarding "Document Formatting
and ECF Filing" (revised dated August 12, 2025), setting the word
limitation for words (inclusive of numbers) marked as confidential at a
maximum of 50 words in cases arising under 28 U.S.C. § 1581(c),
counsel for Plaintiff certifies that the attached Reply Brief contains zero
words marked as confidential, including numbers. This brief therefore
complies with the requirements of Federal Circuit Rules 25.1(d) and
(e)(2).

By:                                          <u>/s/ Henry D. Almond</u>
                                             Henry D. Almond

**Date: March 9, 2026**

## CERTIFICATE ON THE USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

Pursuant to the Court's guidelines regarding "Document Formatting and ECF Filing" (revised dated September 19, 2025), counsel for Plaintiff certifies that the attached Reply Brief the submission was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts.

By:                                         /s/ Henry D. Almond
                                            Henry D. Almond

**Date: March 9, 2026**