UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| SEAFOOD EXPORTERS ASSOCIATION OF INDIA, *Plaintiff,* | |
| v. | Ct. No. 25-00031-MMB |
| UNITED STATES, *Defendant,* | |
| and | Non-Confidential Version |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, *Defendant-Intervenors.* | Business Proprietary Information is removed from pages 8, 47, 48 and 50. |

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS RULE 56.2
MOTION FOR JUDGMENT ON THE AGENCY RECORD

DATED: August 22, 2025
REVISED BRACKETING: May 19, 2026

**TABLE OF CONTENTS**

I.    Introduction ..........................................................................................1

II.   Statement Pursuant to Rule 56.2 ......................................................3

   A.  Administrative Determinations Under Review .............................3

   B.  Issues Presented and Summary of Argument ...............................3

III.  Statement of the Case........................................................................5

   A.  Statutory Framework......................................................................5

   B.  Statement of Facts .........................................................................6

IV.   Subject Matter Jurisdiction ............................................................10

V.   Standard of Review .........................................................................10

   A.  The Commission Must Support its Determinations with
   Substantial Record Evidence ............................................................10

   B.  The Commission's Determinations Must Be in Accordance with
   Law.....................................................................................................13

VI.   Argument..........................................................................................15

   A.  The Commission Did Not Adequately Consider Statistical
   Evidence and Data on the Record Regarding Domestic Industry
   Supply Constraints.............................................................................15

      1.  SEAI Provided Record Evidence Detailing the Impact of
      Significant Supply Constraints, a Key Feature of the Domestic
      Industry and a Condition of Competition Under the Statute .........17

      2.  The Commission Dismissed the ION Report as "Irrelevant" to its
      Statutory Impact Analysis.............................................................29

      3.  The Commission Did Not Address Record Evidence Showing
      Subject Import Volumes Have No Impact on U.S. Producers Due to
      Domestic Supply Constraints ........................................................36

   B.  The Commission's Finding that Cooked Shrimp Is Not a Separate
   Like Product is Unsupported By Substantial Evidence and Not in
   Accordance With Law..........................................................................42

VII.  Conclusion.......................................................................................51

<u>CONFIDENTIAL MATERIAL OMITTED</u>

The material omitted on pages 8, 48, and 50 describes the circumstances of domestic and foreign producers' precise production of one product type; the material omitted on page 47 describes the precise dollar figure investment amount domestic producers reported relating to production of one product type. This material was designated by the Commission as confidential subject to administrative protective order pursuant to 19 U.S.C. § 1677f(b)

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
791 F.Supp.2d 1327 (Ct. Int'l Trade 2011) ........................................ 12

*Allegheny Ludlum Corp. v. United States,*
287 F.3d 1365 (Fed. Cir. 2002) ......................................................... 13

*Altx, Inc. v. United States,*
26 C.I.T. 709 (2002) .................................................................... 37, 38

*Atlantic Sugar, Ltd. v. United States,*
744 F.2d 1556 (Fed. Cir. 1984) ......................................................... 11

*Consol. Edison Co. of New York v. N.L.R.B.,*
305 U.S. 197 (1938) ............................................................................ 11

*CS Wind Vietnam Co. v. United States,*
832 F.3d 1367 (Fed. Cir. 2016) ......................................................... 11

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) ............................................................................ 28

*Hynix Semiconductor, Inc. v. United States,*
431 F.Supp.2d 1302 (Ct. Int'l Trade 2006) ....................................... 41

*JMC Steel Group v. United States,*
24 F. Supp. 3d 1290 (Ct. Int'l Trade 2014) ...................................... 12

*LMI-La Metalli Industriale, S.p.A. v. United States,*
912 F.2d 455 (Fed. Cir. 1990) ........................................................... 13

*Mexichem Fluor Inc., v. United States,*
179 F.Supp.3d 1238 (Ct. Int'l Trade 2016) ....................................... 37

*Mid Continent Nail Corp. v. United States,*
846 F.3d 1364 (Fed. Cir. 2017) ......................................................... 14

*Mitsubishi Materials Corp. v. United States,*
820 F. Supp. 608 (Ct. Int'l Trade 1993) .............................................. 12

*Motor Vehicle Mfrs. Assn v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .............................................................. 15, 28

*Nippon Steel Corp. v. U.S. Int'l Trade Comm'n,*
345 F.3d 1379 (Fed. Cir. 2003) ........................................................ 27

*Nippon Steel Corp. v. United States,*
182 F.Supp.2d 1330 (Ct. Int'l Trade 2001) ........................................ 37

*Nippon Steel Corp. v. United States,*
19 C.I.T. 450 (Ct. Int'l Trade 1995) ............................................ 43, 44

*Nippon Steel Corp. v. United States,*
337 F.3d 1373 (Fed. Cir. 2003) ........................................................ 11

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006) ........................................................ 11

*OCP S.A. v. United States,*
658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ......................... 17, 37, 38

*OCP S.A. v. United States,*
No. 1:21-CV-00219 (SAV), 2025 WL 1837257 (Ct. Int'l
Trade Apr. 22, 2025) ................................................................. 14, 28

*Shandong Rongxin Import Export Co., Ltd. v. United States,*
163 F. Supp. 3d 1249 (Ct. lnt'l Trade 2016)...................................... 36

*Shandong TTCA Biochemistry Co. v. United States,*
774 F.Supp.2d 1317 (Ct. Int'l Trade 2011) ....................................... 37

*Star Fruits S.NC. v. U.S.,*
393 F.3d 1277 (Fed. Cir. 2005) ........................................................ 14

*Titanium Sponge from Japan and Kazakhstan,*
USITC Inv. No. 701-TA-587 (Oct. 2017),USITC Pub. 4736.............. 27

*Torrington Co. v United States,*
747 F. Supp. 744 (Ct. Int'l Trade 1990) ........................................... 43

iv

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik
    Tube AB*,
    975 F.2d 807 (Fed. Cir. 1992) .............................................................. 13

*Tropicana Prods., Inc. v. United States*,
    484 F. Sup. 2d 1330, 1333 (Ct. Int'l Trade 2007) ............................... 5

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) ............................................................ 13

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ................................................................... *passim*

*USX Corp. v. United States*,
    655 F.Supp. 487 (Ct. Int'l Trade 1987) ............................................. 36

*Wind Tower Trade Coal. v. United States*,
    569 F. Supp. 3d 1221 (Ct. Int'l Trade 2022) ..................................... 12

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) .................................................... 13, 29

## Administrative Materials

*Frozen Warmwater Shrimp from Brazil, China, India,
    Thailand, and Vietnam*,
    Inv. Nos. 731-TA-1063, 1064, 1066-1068 (Review), USITC
    Pub. 4221 (Mar. 2011) ....................................................................... 20

*Frozen Warmwater Shrimp from Brazil, China, India,
    Thailand, and Vietnam*,
    Inv. Nos. 731-TA-1063-1064 and 1066-1068 (Second
    Review), USITC Pub. 4688 (May 2017) ............................................. 20

*Frozen Warmwater Shrimp from China, Ecuador, India,
    Malaysia, and Vietnam*,
    Inv. Nos. 701-TA-491-493, 495, and 497 (Final), USITC
    Pub. 4429 (Oct. 2013)......................................................................... 20

*Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam,*
  Inv. Nos. 731-TA-1064 and 1066-1068 (Third Review),
  USITC Pub. 5432 (Jun. 2023) ............................................................. 20

*Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam,*
  Inv. Nos. 701-TA-699-700 and 702 (Final), USITC Pub.
  5566 (Dec. 2024) ..................................................................... *passim*

*Titanium Sponge from Japan and Kazakhstan*
  Inv. No. 701-TA-587, USITC Pub. 5566 (Dec. 2024) .......................... 27

## Statutes

19 U.S.C. § 1516a(a)(2)(A)(i)(II) ...................................................... 10

19 U.S.C. § 1516a(a)(2)(B)(i) ........................................................... 10

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................... 10

19 U.S.C. § 1516a(b)(2)(A) ............................................................... 12

19 U.S.C. §1671d(b) ........................................................................ 10

19 U.S.C. § 1673d(b) ....................................................................... 10

19 U.S.C. § 1677(1) ......................................................................... 42

19 U.S.C. § 1677(4)(A) ..................................................................... 42

19 U.S.C. § 1677(7)(A) ....................................................................... 5

19 U.S.C. § 1677(7)(B)(i)................................................................ 6, 16

19 U.S.C. § 1677(7)(C) ........................................................... *passim*

19 U.S.C. § 1677f(i)(3)(b) ................................................................. 15

28 U.S.C. § 1581(c)........................................................................... 10

## **Regulations**

19 C.F.R. § 207.4(a) ............................................................................... 6

19 C.F.R. § 207.15.................................................................................. 6

19 C.F.R. § 207.23.................................................................................. 6

19 C.F.R. § 207.25.................................................................................. 6

21 C.F.R. 123.6(b)(2)............................................................................. 47

## **Other Authorities**

Uruguay Round Agreements Act, Statement of
    Administrative Action, H.R. Doc. No. 103-316, vol. I
    (1994) ................................................................................................ 6

## GLOSSARY

| Acronym | Item |
|---------|------|
| SEAI | Seafood Exporters Association of India |
| POI | period of investigation |
| NOAA | National Oceanic and Atmospheric Administration |
| COGS | cost of goods sold |
| CPUE | catch per unit effort |
| AHSTAC | Ad Hoc Shrimp Trade Action Committee |

I.      Introduction

In the final determination at issue before the Court, the Commission found, through dismissal of key record evidence and misapplication of law, that U.S. imports of frozen warmwater shrimp from India, Vietnam, Indonesia, and Ecuador cause material injury to the domestic industry. Many aspects of the Commission's injury analysis with respect to the volume, price, and impact of subject imports was significantly flawed. However, to avoid duplication and in accordance with the Court's Scheduling Order, ECF No. 31, SEAI is addressing two of the most significant errors in the Commission's analysis.

Specifically, SEAI first addresses the Commission's dismissal of key record evidence showing the domestic industry faces raw material constraints that render it unable to produce larger volumes of frozen shrimp, which could potentially improve its financial performance, to serve the vast majority of U.S. market demand, creating a large supply gap which imports fill without harming the domestic industry. This fundamental reality of the shrimp industry in the United States is a key "condition of competition" that impacts each factor of the Commission's statutory injury analysis and undermines its causation

analysis, but was insufficiently addressed in the Commission's final determination. Upon a full and proper examination of the record the Commission should have reached a negative determination.

SEAI next explains that the Commission erred in finding that frozen cooked shrimp should not be subject to a separate injury analysis, despite record evidence showing cooked shrimp differs significantly from frozen raw shrimp and is not produced in meaningful quantities by the domestic industry. The Commission should have found that cooked shrimp are a separate class of kind of merchandise, evaluated the cooked frozen and raw frozen shrimp industries separately, and determined that no injury exists with respect to the cooked shrimp industry.

While SEAI's brief focuses on these two primary issues as raised in its Complaint, ECF No. 7, SEAI supports and incorporates by reference the arguments raised in the Indonesian and Vietnamese Respondent's separate joint motion for judgment on the agency record and accompanying memorandum (Court Nos. 25-00032 and 25-00035), which addresses the remaining aspects of the Commission's determination, which are not supported by substantial evidence nor in

accordance with law. SEAI also supports the Ecuadorian Respondent's motion for judgment on the agency record and accompanying memorandum (Court No. 25-00029).

## II. Statement Pursuant to Rule 56.2

### A. Administrative Determinations Under Review

This action seeks judicial review of the Commission's final affirmative determination in the antidumping and countervailing duty investigations of frozen warmwater shrimp from Ecuador, India, Indonesia, and Vietnam.  *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, 89 Fed. Reg. 10,2163 (Int'l Trade Com'n Dec. 17, 2024), Appx001354; Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam, Inv. Nos. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024) ("*Final Determination*"), Appx001355-001708. *See also* the confidential version of the Commission's Views ("Views"), Appx001265-001353.

### B. Issues Presented and Summary of Argument

1. Was the Commission's *Final Determination* supported by substantial evidence and in accordance with law, in view

of its finding that domestic supply constraints were not relevant to its injury analysis?

No. The Commission erroneously overlooked record evidence on the domestic industry's raw material supply constraints. This fundamental limitation, which prevents the domestic industry from expanding and increasing profitability, is a key condition of competition which should have framed the Commission's injury analysis. The Commission also, without reasoned explanation, dismissed evidence that there is no statistical relationship between the U.S. shrimp harvests and key market conditions, including subject import volumes, demonstrating that U.S. supply is inelastic to market changes. Together, this evidence indicates that volumes of subject imports are not significant and that supply constraints, not subject imports, are the cause of any injury to the domestic industry, undermining both the Commission's injury and causation analysis.

2. Was the Commission's finding that frozen cooked shrimp is not a separate like product distinct from frozen raw shrimp supported by substantial evidence and in accordance with law?

No. In its like product analysis, the Commission did not adequately consider the record evidence showing that channels of trade, purchaser

4

perceptions, and production equipment and methods are substantially different between the raw and cooked shrimp. The domestic industry's lack of meaningful production of cooked shrimp underscores the fundamental differences between cooked and raw frozen shrimp, which the Commission did not adequately address in its analysis.

III.    Statement of the Case

A. Statutory Framework

Under the relevant provisions of the Tariff Act of 1930, as amended, when determining whether a domestic industry is experiencing material injury, "the Commission must find: (1) a present material injury or a threat thereof and (2) causation of such harm by reason of subject imports." *Tropicana Prods., Inc. v. United States*, 484 F. Sup. 2d 1330, 1333 (Ct. Int'l Trade 2007) (citations omitted). As defined in the statute, "material injury" is "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). To assess whether an industry in the United States (the "domestic industry") is facing or threatened with material injury by reason of subject imports, the Commission must consider three statutory factors, including: (1) the volume of subject imports; (2) any price effects subject imports have on

5

the domestic like products; and (3) the "impact" of subject imports on domestic producers. 19 U.S.C. § 1677(7)(B)(i)(I)-(III). As a part of its analysis of these three statutory factors, the Commission must also "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). In considering these factors, the Commission relies on the record evidence, which includes "{a}ll material properly filed," including briefs and supporting exhibits filed by interested parties. 19 C.F.R. §§ 207.4(a), 207.15, 207.23, 207.25.

Finally, as described by the legislative history, the statute requires the Commission to assess whether any injury is "by reason of" subject imports and also requires that it "examine other factors to ensure that it is not attributing injury from other sources to the subject imports." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I at 851-52 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773.

B. Statement of Facts

The product subject to the Commission's investigation is frozen warmwater shrimp, which "are crustaceans that usually inhabit salt

6

waters in coastal regions in the tropics and subtropics or freshwaters." Views, Appx001272. The investigation began pursuant to an October 25, 2023 antidumping and countervailing duty petition the American Shrimp Processors Association filed alleging that the domestic industry is materially injured, or threatened with material injury, by reason of subsidized and dumped imports of frozen warmwater shrimp from Ecuador, India, Indonesia, and Vietnam. On June 16, 2023, the Commission published its preliminary affirmative determination of a reasonable indication of material injury by reason of subject imports of frozen warmwater shrimp. *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, 88 Fed. Reg. 86,677 (Dec. 14, 2023), Appx056538.

Throughout the course of the proceeding parties submitted questionnaire responses, briefs, and comments to the Commission, and participated in the Commission's final phase investigation. As relevant to this action, we briefly highlight here some of the key factors and considerations relevant to the claims addressed herein. With respect to the product at issue, frozen warmwater shrimp may be processed to differing degrees, including peeled, deveined, and shell-off products.

7

Staff Report, Appx001026. Frozen cooked shrimp is one product resulting from such further processing, which three-quarters of responding U.S. purchasers stated is never interchangeable with frozen raw shrimp. *Id.*, Appx001042. 70 percent of U.S. producers are unable to produce cooked frozen shrimp. *Id.*, Appx001072. While just 15 percent of U.S. producers reported producing frozen cooked shrimp during the period of investigation ("POI"), domestic processors do not produce any meaningful quantity of cooked shrimp and accounted for just **[ # ]** percent of U.S. domestic processor shipments during the POI. *Id.*, Appx001072; Appx001097. In contrast, "the majority of U.S. shipments of subject imports was {peeled and deveined} or cooked shrimp," which accounted for**[ # ]** percent of subject U.S. shipments during the POI. *Id.*, Appx001096-001098.

Subject imports and the domestic like product are distinct in other important ways. Imported warmwater shrimp are typically farm-raised in ponds, whereas virtually all warmwater shrimp production is wild-caught (*i.e.*, harvested from the ocean). Views, Appx001272. As a result, U.S. processors are subject to "{t}he availability of fresh wild-caught shrimp {which} also limits processors' ability to increase production

8

because of biological/environmental limits on the amount of fresh shrimp that can be fished from U.S. waters." Staff Report, Appx001032.

Due to these production constraints, domestic processors are unable to supply the vast majority of U.S. demand. Indeed, throughout the POI, U.S. processors were unable to supply even eight percent of apparent consumption. Views, Appx001308. While U.S. processor market share has fluctuated, because demand has expanded dramatically since 2001, SEAI Prehearing Brief, Appx044327-044328, the industry's supply of raw shrimp as measured by U.S. shrimp landings (*i.e.*, shrimp harvest) has remained relatively constant. SEAI Prehearing Brief, Appx044333; Appx044341; Appx044411; Appx044418; Appx044467-044473. When POI trends are viewed in a broader historical context, these data in addition to statistical analysis make clear that U.S. shrimp landings, which directly dictate U.S. production, has remained fixed and unresponsive to many market conditions, including import volumes. *Id.*, Appx044416-044436.

After considering these issues and considerations, in its *Final Determination*, the Commission found subject imports were "significant in absolute terms and relative to production and consumption in the

9

United States" and that while the domestic industry faces supply constraints, this factor is "irrelevant" because the Commission relied on other "evidence on the record that subject imports adversely impacted the domestic industry during the POI" to come to an affirmative injury determination. Views, Appx001316; Appx001340.

IV.    Subject Matter Jurisdiction

SEAI brings this action pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) to review final affirmative determinations made by the Commission under 19 U.S.C. §§ 1673d(b) and 1671d(b). As a result, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(c).

V.    Standard of Review

The Court will hold the Commission's injury determinations unlawful where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). These standards are detailed below in turn.

A. The Commission Must Support its Determinations with Substantial Record Evidence

The Commission's factual findings and conclusions cannot be upheld if they are "unsupported by substantial evidence on the record." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant

10

evidence as a reasonable mind might accept as adequate to support a conclusion." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)); *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). "{S}ubstantial evidence is more than a mere scintilla." *Universal Camera*, 340 U.S. at 477 (quoting *Consol. Edison Co.*, 305 U.S. at 229).

To satisfy the "substantial evidence" standard, the Commission must take into account "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). The Court may not sustain the Commission's determination as supported by substantial evidence if it does not take "into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera*, 340 U.S. at 487-488 (reviewing authority must consider "the record in its entirety . . . , including the body of evidence opposed to the {agency's} view").

The Commission's factual findings "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608, 624 (Ct. Int'l Trade 1993); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F.Supp.2d 1327, 1334 (Ct. Int'l Trade 2011) (because the agency "failed to take into account record evidence that fairly detracts from the weight of the evidence supporting its . . . determinations, these determinations are not supported by substantial evidence."). While the agency is not required to "address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermine{} its reasoning and conclusion." *Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221, 1248 (Ct. Int'l Trade 2022) (citations omitted); *see also JMC Steel Group v. United States*, 24 F. Supp. 3d 1290, 1304 (Ct. Int'l Trade 2014). "Record evidence" under the Court's standard of review includes all information "presented to or obtained by" the Commission during its investigation. 19 U.S.C. § 1516a(b)(2)(A). Accordingly, the Commission may not dismiss

12

significant record evidence without meaningful substantive engagement.

Finally, the Commission cannot rest on speculations or assumptions unsupported by the record. *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). Particularly where relevant record evidence exists, the Commission's "speculation. . . must yield to evidence." *LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990).

### B. The Commission's Determinations Must Be in Accordance with Law

To be "in accordance with law," the Commission's determination must comply with the countervailing duty statute. The Court "review{s} the Commission's conclusions of law *de novo*." *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1369 (Fed. Cir. 2002) (citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1356 (Fed. Cir. 1996)).

The Commission, at minimum, must act consistently with the statute and "shall consider" each mandatory injury factor and explain why the record supports its finding. *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 814 (Fed. Cir. 1992) (the "core factors directed by the statute" are the "mandated 'minimum'

13

analysis"). Thus, a determination is not in accordance with law if, in considering the volume, price, or impact of subject imports on the domestic industry, the Commission does not adequately "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry," as directed by statute. 19 U.S.C. § 1677(7)(C)(iii)(V); *see also OCP S.A. v. United States*, No. 1:21-CV-00219 (SAV), 2025 WL 1837257, at *1 (Ct. Int'l Trade Apr. 22, 2025) ("*OCP II*").

Additionally, to be "in accordance with law," the Commission cannot act arbitrarily and must exercise discretion reasonably. *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ("Commerce's decision will be set aside if it is arbitrary and capricious."); *see also Star Fruits S.NC. v. U.S.*, 393 F.3d 1277, 1281 (Fed. Cir. 2005) ("An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighting relevant factors.").

The Commission acts arbitrarily if it does not articulate a reasonable explanation for its decision. Indeed, the statute requires the

14

Commission "to include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties . . . concerning volume, price effects, and impact on the industry of imports of the subject merchandise." 19 U.S.C. § 1677f(i)(3)(b). The Commission does not provide an adequate explanation and therefore acts arbitrarily where it does not consider "an important aspect of the problem" or "offer{s} an explanation for its decision that runs counter to the evidence." *Motor Vehicle Mfrs. Assn v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Overall, the Court must ensure the Commission has provided sound reasoning to support its determination.

VI. <u>Argument</u>

A. <u>The Commission Did Not Adequately Consider Statistical Evidence and Data on the Record Regarding Domestic Industry Supply Constraints</u>

As detailed in the sections that follow, the central and overarching factor that should have informed the Commission's analysis in reaching its determination is the harvest limitations that constrain the domestic industry's ability to serve the vast majority of the U.S. market and prevent the U.S. industry from expanding production to increase profit.

As described above, the domestic industry is reliant on wild-caught shrimp as a principal raw material input, which is indisputably constrained by the amount of shrimp U.S. fisherman can feasibly harvest. Views, Appx001340; Hearing Transcript, Appx058419, Appx058427-058430. Historical trends show the domestic shrimp harvest has remained constant for decades, and that this key condition of the domestic industry is not only highly unlikely to change, but is unrelated to market conditions including the volume of subject imports.

The Commission treated this evidence merely as a possible factor which may speak to the adverse impact of imports on the domestic industry. But as detailed below, this evidence was a key "condition{} of competition" which should have framed the Commission's volume, price, and impact analysis. 19 U.S.C. § 1677(7)(B)(i); 19 U.S.C. § 1677(7)(C). Supply constraints also sever the causal link between subject imports and any injury to the domestic industry. The Commission's lack of engagement with this record evidence in its statutory analysis was unsupported by substantial evidence and not in accordance with law.

To be clear, while SEAI takes issue with the Commission's weighing of the factual evidence, the central flaw is not just in how the

16

Commission evaluated the evidence. Rather, the Commission did not properly account for a central market and competition factor throughout its analysis, contrary the statute.

   1. <u>SEAI Provided Record Evidence Detailing the Impact of Significant Supply Constraints, a Key Feature of the Domestic Industry and a Condition of Competition Under the Statute</u>

The Commission is obligated by statute to "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C). The Commission's analysis of volume, price effects, and adverse impacts must be framed by the essential conditions of competition relevant to the domestic industry. *Id.* "{T}he Commission's practice is to perform this analysis by making findings about U.S. market characteristics, U.S. purchasers, the supply chain, geographic distribution, demand trends, substitutability, purchasing patterns, elasticity, and other aspects of the market for the subject merchandise." *OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1312 (Ct. Int'l Trade 2023) ("*OCP I*"). The Court has previously found that limits on the domestic industry's ability to supply U.S. demand is a

17

condition of competition that must be considered in the Commission's injury analysis. *Id.* at 1319-1320.

A key condition of competition distinctive to the U.S. industry is that domestic shrimp availability is tied to a finite supply of fresh warmwater shrimp, which has historically significantly limited the domestic industry's ability to meet U.S. demand. This basic condition of competition means that any fluctuation in U.S. processor production volume, price, market share, or any metric of economic performance is tied to factors which impact that finite quantity of shrimp, not subject imports, as confirmed by statistical analysis on the record.

In particular, key evidence on the record of this investigation was statistical analysis based on historic public data prepared by economic experts at ION Economics (the "ION Report"). SEAI Prehearing Brief, Appx044415-044925. The ION Report provided key insights regarding U.S. supply constraints and the role of imports in the U.S. shrimp market using reliable data sources, including historical shrimp statistics reports from the National Oceanic and Atmospheric Administration ("NOAA"), U.S. processors' financial statements, the Commission's own data collected in prior proceedings involving frozen

18

warmwater shrimp, and official U.S. import statistics. SEAI Prehearing Brief, Appx044438-044442; SEAI Hearing Testimony, Appx058222-058235. The ION Report included both: (1) the actual historical underlying data on the volume of U.S. shrimp landings, which was also separately provided on the record; and (2) regression analysis to show the relationship of U.S. landings to different market variables, including import volumes, ex-vessel prices, and diesel prices. SEAI Prehearing Brief, Appx044411, Appx044444-044924. These data and the accompanying analysis did not suggest the constraint was that the ocean would "run out of" shrimp, but instead that a wealth of information and historical data confirms that the U.S. shrimp harvest remains relatively constant and cannot serve the vast majority of demand. *Id.*, Appx044415-044436.

This data and analysis established a key feature of the domestic industry: the quantity of domestic landings (that is, the shrimp harvest) has not varied to any meaningful degree since at least 2006. *Id.*, Appx044333, Appx044341; Appx044411, Appx044417-044418. The landings data is relevant because it represents U.S. processor's principal raw material supply. Without increased landings, even with

19

excess processing capacity, U.S. processors are unable to increase production.

While domestic landings have remained consistent throughout the years, dating back to 2001, data on the record from the Commission's prior frozen warmwater shrimp proceedings demonstrates that U.S. demand and consumption climbed 70 percent over the decades spanning from 2001 to 2023. *Id.*, Appx044327-044328.[1] These data points alone demonstrate that domestic production of warmwater shrimp has historically been unable to grow in relation to U.S. demand, constrained by the unchanging levels of domestic landings, which the Commission does not dispute in its *Final Determination*.

Building on these historical data points, the ION Report presented additional data and a new statistical analysis, which the Commission

---

[1] As cited in SEAI's Prehearing Brief, this data comes from the Commission's prior final determinations on frozen warmwater shrimp, including: *Certain Frozen or Canned Warmwater Shrimp and Pawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1068 (Final), USITC Pub. 3748 (Jan. 2005); *Frozen Warmwater Shrimp from Brazil, China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063, 1064, 1066-1068 (Review), USITC Pub. 4221 (Mar. 2011); *Frozen Warmwater Shrimp from China, Ecuador, India, Malaysia, and Vietnam*, Inv. Nos. 701-TA-491-493, 495, and 497 (Final), USITC Pub. 4429 (Oct. 2013); *Frozen Warmwater Shrimp from Brazil, China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1064 and 1066-1068 (Second Review), USITC Pub. 4688 (May 2017); *Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1064 and 1066-1068 (Third Review), USITC Pub. 5432 (Jun. 2023); Prehearing Report, Appx043897- 043901.

has never considered in the context of any proceeding addressing frozen warmwater shrimp imports. Through regression analysis, the ION Report showed that domestic landings not only remained constant throughout the decades, but that they also have no statistical relationship to import volumes, ex-vessel prices (*i.e.*, the price that U.S. processors pay fisherman for their harvest), or diesel prices. SEAI Prehearing Brief, Appx044417-044435. This statistical evidence directly impacts a key underpinning of the Commission's findings and the domestic industry's central argument: that with antidumping and/or countervailing duties, the source of the domestic industry's injury will be disciplined, which would in turn enable the domestic industry to simply increase production and profits. Hearing Transcript, Appx058383 ("There's no way we're at that maximum {production} level."). The ION Report shows this is simply not the case, as supply constraints will continue to limit domestic producers' ability to supply a significant portion of U.S. demand.

Overall, as described in the ION Report and by SEAI in multiple submissions and during the hearing before the Commission, the findings outlined in both the ION Report and NOAA domestic landings

21

data demonstrate: (1) that U.S. processors are simply unable to fulfill a significant portion of U.S. demand due to fixed supply constraints; and (2) domestic shrimp harvest volumes historically cannot meaningfully adjust in response to market conditions, including import volumes.

Not only did the ION Report base its analysis on reputable, publicly available data sources, it was also supported by other evidence on the record of the proceeding. For example, while demand decreased from 2021 to 2023, subject import market share increased. Views, Appx001304, Appx001307. Yet, U.S. processors' cost of goods sold ("COGS") to net sales ratio significantly *improved* (*i.e.*, fell), even though subject import market share *increased*. Practically, this data shows that while subject import market share rose, sales revenue was growing as cost was decreasing, resulting in greater per-unit net sales values compared to cost for U.S. producers. SEAI Prehearing Brief, Appx044347 (citing Staff Report, Appx001149), Appx044361-044362 (citing Staff Report, Appx001159). This unexpected result further supports the ION Report's conclusion that market conditions including subject import volumes have no impact on domestic landings, and thus on U.S. processor supply. SEAI Prehearing Brief, Appx044416. While

the Commission recognized these facts in its *Final Determination*, it did not contextualize these facts in light of U.S. supply constraints (or the ION Report), which was a key prevailing condition of competition. Views, Appx001313-001314, Appx001327.

Data placed on the record by Petitioner Ad Hoc Shrimp Trade Action Committee ("AHSTAC") similarly demonstrates that domestic supply of shrimp is constrained. Specifically, AHSTAC has placed on the record data from NOAA measuring the available stock of the three main species of wild-caught shrimp in U.S. waters. AHSTAC Posthearing Brief, Appx058948-059006. This 2018 data includes historic stock patterns covering the period 1984-2017. *Id.* Included in this stock assessment data is a metric for measuring shrimp availability known as catch per unit effort ("CPUE"), which is used to "estimate the relative abundance of stock." *Id.*, Appx059056. CPUE, similar to landings data, estimates the availability of raw material supply to the domestic industry. As SEAI discussed in the underlying investigation, while this data is not contemporaneous with the POI, the CPUE data demonstrates that while shrimp availability may fluctuate year over year, it is historically and fundamentally limited and has a ceiling. *Id.*

23

Appx058948-059006; SEAI Final Comments, Appx054909-054911. This data also demonstrates that as fishing efforts increase, CPUE decreases due to supply constraints. This has a real world impact: if CPUE remained constant, fishermen would have a strong financial incentive to simply increase harvest and increase profits, regardless of the volume of subject imports. SEAI Final Comments, Appx054911-Appx054912. Instead, supply constraints hinder fishermen from increasing production and profits. This data is in line with the ION Report's findings and other record data showing supply constraints, not subject imports, are the cause of any injury to the domestic industry. The Commission did not engage with this evidence at all in its *Final Determination*.

The Commission appears to recognize that domestic supply constraints are a condition of competition relevant to the domestic industry, as it has identified "supply considerations" as a condition of competition which "inform{ed} our analysis of whether there is material injury by reason of subject imports." Views, Appx001303. But, while the Commission acknowledges that "{i}t is undisputed that there is ultimately some biological limit on the quantity of warmwater shrimp

24

in the Gulf Coast and other U.S. territorial waters that can be harvested during any particular period of time," its analysis went on to ignore record evidence that further explained the impact this limit has on the U.S. shrimp industry overall. *Id.*, Appx001340. Rather than treating this "undisputed" supply constraint as a fundamental condition of competition, the Commission deemed it "irrelevant given evidence on the record that subject imports adversely impacted the domestic industry during the POI." *Id.* In other words, rather than treating this supply constraint as a condition of competition, the Commission found this evidence "irrelevant" because it had already identified other record evidence which it purports demonstrates an adverse impact on the domestic industry.

While the Commission summarizes the supply constraints reported in its questionnaire responses, Views, Appx001305-001307, nowhere in the Commission's "conditions of competition" analysis is there a mention of the undisputed NOAA data from 2001 to 2024 showing domestic landings have not varied to any meaningful degree since 2006. This is a crucial and relevant "supply" consideration impacting the domestic industry, and the Commission's failure to address this

evidence as part of its "conditions of competition" analysis is not in accordance with law.

The Commission also treated the ION Report's regression analysis and other record evidence substantiating U.S. supply constraints as one and the same. *Id.*, Appx001342-001343. Indeed, the Commission appears to reject consideration of U.S. supply constraints generally because it took issue with certain aspects of the ION Report's regression analysis and data sources. *Id.* The Commission sweeps under the rug historical NOAA shrimp statistics reports, U.S. processors' financial statements, the Commission's own data collected in prior proceedings involving frozen warmwater shrimp, and official U.S. import statistics, which independently from the ION Report's regression analysis support the finding that U.S. supply constraints are a key condition of competition and which undermine the Commission's finding that subject imports are the cause of the domestic industry's injury. SEAI Prehearing Brief, Appx044327-044328, Appx044410-Appx044412, Appx044438-044442; SEAI Hearing Testimony, Appx058222-058235. The Commission must give due consideration to the evidence showing significant, persistent supply constraints separately from its findings on

26

the ION Report's regression analysis. This is not to suggest that the Commission properly deemed the regression analysis irrelevant; however, at a minimum, the Commission has to account for the fundamental production volume limits the U.S. industry faces when conducting its injury analysis.

By dismissing this key condition of competition and not accounting for the proven inability of the U.S. domestic producers to supply any significant portion of the U.S. market, the Commission has not adequately supported its causation finding. Here, record evidence shows subject imports are a "minimal or tangential cause of injury" while supply constraints are the key driver of any injury, as the domestic industry is unable to expand production and increase profits. *See Titanium Sponge from Japan and Kazakhstan*, Inv. No. 701-TA-587, USITC Pub. 4736 (Oct. 2017) at 18 (*citing Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 345 F.3d 1379, 1314 (Fed. Cir. 2003)). Because supply constraints explain why the domestic industry is unable to serve the vast majority of U.S. demand, any causal link between subject imports and any alleged injury is severed, or at least significantly weakened. At minimum, the Commission must address significant

27

record evidence detracting from its conclusion that the domestic industry is injured "by reason of" subject imports by explaining why supply constraints are not the source of the domestic industry's injury.

Overall, the Commission's lack of engagement with key evidence on U.S. supply constraints, in particular the ION Report, contravenes its duty to "apply its 'conditions of competition' analysis to each of the three statutory factors," as the CIT has confirmed is necessary for the Commission to fulfill its statutory mandate. *OCP II*, 2025 WL  at *1. The Commission did not "provide even the minimum level of analysis" for omitting mention of the domestic industry's supply constraints. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016). This omission also amounted to a failure to consider "an important aspect of the problem." *State Farm*, 463 U.S. 29, 43 (1983). Ultimately, the Commission's decision not to address the domestic industry's supply constraint as a "condition{} of competition" is therefore arbitrary and not in accordance with law. As a result, the Court should remand the Commission's determination with instructions to consider the ION Report's findings on supply constraint as a "condition of competition"

28

which must frame the Commission's statutory volume, price, and impact analysis.

### 2.    The Commission Dismissed the ION Report as "Irrelevant" to its Statutory Impact Analysis

When assessing the impact of subject imports on the domestic industry, the Commission must "evaluate all relevant economic factors which have a bearing on the state of the industry in the United States." 19 U.S.C. § 1677(7)(C)(iii). The Commission analyzes the impact of imports on domestic producers "only in the context of production operations within the United States." 19 U.S.C. § 1677(7)(B)(i)(III).

In addressing this injury factor, the Commission begins by referencing an "undefined" biological limit on shrimp available for U.S. fishermen to catch, claims no evidence on the record suggests the domestic industry cannot increase production, and uses this logic to dismiss the ION Report and other information on domestic supply constraints as "irrelevant." Views, Appx001340. This logic is exactly the kind of arbitrary reasoning the Court has found to be unsupported by substantial evidence, as the Commission may not rely on speculation or the absence of evidence in its conclusions. *Bestpak*, 716 F.3d at 1378.

29

As described above, it is true that the ION Report does not quantify the actual biological limit of shrimp available in U.S. waters. This analysis shows the Commission fundamentally misunderstood the analysis presented in the ION Report. The ION Report quantified the *practical* rather than absolute supply constraint based on historical data and then provided a statistical assessment of the impact of the existence of the supply constraint. The Commission's focus on an "undefined" biological limit appears to impose an unreasonable evidentiary burden–essentially that absent a definitive census of all of the shrimp in U.S. waters, any observed supply constraints are conjecture. The analysis SEAI presented and included in the ION Report also did, in fact, demonstrate that historical data showed the domestic industry cannot practically increase production. The Commission simply did not engage with the crux of the ION Report, which it must be directed to do on remand.

Instead, the Commission relied on self-reported data from fishermen and U.S. processors that the availability of shrimp did not affect their supply or processing of shrimp, as well as figures on U.S. inventory during the POI. Views, Appx001340-001341. But in concentrating on

30

POI trends in isolation, the Commission's cursory analysis cherry picks facts that favor its conclusion while missing the ION Report's point entirely, which is that the historical, empirical data demonstrating U.S. supply of raw shrimp has fluctuated within a very narrow band for decades, despite shifting market conditions throughout the years. Data collected from government agencies confirms this reality, including the Commission's data throughout the years as a part of its frozen warmwater shrimp proceedings. SEAI Prehearing Brief, Appx044327-044328.

The Commission also found that "the quantity of wild-caught shrimp harvested by U.S. fishermen during the POI, and hence the quantity of domestic production of frozen warmwater shrimp by U.S. processors. . . is largely dictated by the financial incentives for fishermen to harvest shrimp" and specifically that fishing efforts are linked to "declining ex-vessel prices as a result of competition from subject imports." Views, Appx001341. The Commission's findings, however are directly contradicted by the ION Report's conclusion that ex-vessel prices have no statistical relationship to the quantity of shrimp harvested. SEAI Prehearing Brief, Appx044419-044433. Projections based on the U.S.

31

fishermen and processors' financial statements also show that domestic industry profit would increase if U.S. fishermen increased their catch, regardless of subject imports. SEAI Posthearing Brief, Appx045758-045760, Appx045828. Thus, there does, in fact, exist a significant "financial incentive{} for fishermen to harvest shrimp" in light of what Petitioners in the underlying investigation and the Commission contended is an unconstrained amount of supply. Views, Appx001341. The fact that U.S. fishermen have not already increased their catch in the face of significant growth in demand over years simply highlights that supply constraints rather than subject imports hamper the U.S. industry's growth. SEAI Final Comments, Appx054911-054912. That is, if increasing domestic landings and therefore production was possible as the Commission and the domestic industry have suggested, one would have expected landings and production to surge in response to increased demand to make up for the fall in the prices. This was simply not the case during the POI, as U.S. fishermen's catch remained at historic levels, unresponsive to market conditions including imports, indicating that supply constraints are the source of any injury the domestic injury is experiencing. Despite the weight of evidence to the contrary, the

Commission provides no reasoning for relying on anecdotal, self-reported information over statistical analysis based on historical data, aside from its brief dismissal of the ION Report. The Commission must engage in actually weighing all evidence on the record, including the ION Report, for its findings to be supported by substantial evidence. *Universal Camera*, 340 U.S. at 488, 490.

Moreover, the Commission's engagement with the ION report was limited to the context of its "adverse impact" analysis under 19 U.S.C. § 1677(7)(B)(i)(III). As detailed above, the Commission's analysis was insufficient, flawed, and did not consider "whatever in the record fairly detract{ed}" from its preferred outcome, rendering it unsupported by substantial evidence and not in accordance with law. *Universal Camera*, 340 U.S. at 488, 490.

The Commission also took issue with some technical aspects of the ION Report's analysis. Views, Appx001342-001343. However, these issues were addressed on the record and were otherwise not a valid basis to wholesale deem the report "irrelevant." Specifically, the Commission states that the ION report was "unable to include substantial data regarding landings in the South Atlantic. . . because

those data were not available from {NOAA}." *Id.*, at Appx001342.

However, ION explained that "Gulf landings were used as a proxy for total U.S. warmwater shrimp landings" because they account, on average, for approximately 90 percent of total U.S. landings. SEAI Briefing Brief, Appx044418 (n. 3); Appx044439. The Commission does not account for this explanation, which explains why the ION Report's reliance on Gulf landings data was reasonable and did not undermine the report's findings.

And while the Commission notes that the ION Report "did not perform any multiple regression analyses," it stops short of providing any economic reason why "test{ing} the relationship between a single independent variable. . .and the dependent variable" is unreliable or inaccurate. Views, Appx001342. Similarly, the Commission dismisses the report because it had a "focus on" the time period 2012 through June 2024 "in which imports dominated the U.S. shrimp market." *Id.* The report's data on U.S. landings dated back to 2006, and additional evidence on the record dates back to 2001. SEAI Prehearing Brief, Appx044411; Appx044444-044449. As a result, the Commission's critique does not address the data showing unchanging levels of

34

domestic landings from 2001 to 2024 when the record and the Commission's prior determinations show that market conditions changed dramatically over this period.

The Commission's dismissal of the ION report because it looked to a period "where imports dominated the U.S. shrimp market" also brushes aside the key problem with its analysis–that imports necessarily must dominate the market on a volume basis because U.S. consumers demand more shrimp than U.S. waters and fishing can supply, as demonstrated in the ION Report and elsewhere in the record. While the regression analysis portion of the ION Report's analysis focuses on 2012 onward to ensure accuracy in light of data limitations for data in prior years, the Commission's note that imports dominated the market does not diminish the analysis, and at minimum the Commission does not explain why this undermines the analysis.[2]

Overall, in the only context in which the Commission analyzed the ION Report's findings or engaged at all with evidence regarding the domestic industry's supply constraints, it did not support its findings

---

[2] A further explanation and defense of the ION Report's economic analysis was provided in SEAI's Final Comments, Appx054912-054916.

with substantial evidence. Rather than adequately considering "whatever in the record fairly detracts" from its preferred outcome, *Universal Camera*, 340 U.S. at 488, 490, the Commission instead based its findings "on isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *Shandong Rongxin Import Export Co., Ltd. v. United States*, 163 F. Supp. 3d 1249, 1252 (Ct. lnt'l Trade 2016) (citation omitted). The Commission also acted arbitrarily because it did not provide a reasoned explanation for its finding that the ION Report and other record evidence showing domestic supply constraints was entirely "irrelevant," and thus its conclusion is not in accordance with law.

      3.     The Commission Did Not Address Record Evidence Showing Subject Import Volumes Have No Impact on U.S. Producers Due to Domestic Supply Constraints

In assessing injury, the Commission must also "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). This Court has clarified that "{i}t is the significance of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis{.}" *USX Corp. v.*

36

*United States*, 655 F.Supp. 487, 490 (Ct. Int'l Trade 1987). To determine if a volume of imports is significant, the Commission "must analyze the volume and market share data in the context of the conditions of competition." *OCP I*, 658 F.Supp. at 1319. (quoting *Nippon Steel Corp. v. United States,* 182 F.Supp.2d 1330, 1335 (Ct. Int'l Trade 2001)). *See also Mexichem Fluor Inc., v. United States*, 179 F.Supp.3d 1238, 1243 (Ct. Int'l Trade 2016); *Shandong TTCA Biochemistry Co. v. United States*, 774 F.Supp.2d 1317, 1322 (Ct. Int'l Trade 2011) (quoting 19 U.S.C. § 1677(7)(C)(i)).

When assessing the nexus between conditions of competition and volume impacts specifically, the Court has found that the Commission must "analyze the significance of subject import volume in terms of product types available and practically unavailable from U.S. sources during the {period of investigation}{.}" *Altx, Inc. v. United States*, 26 C.I.T. 709, 718 (2002) (finding the Commission's analysis deficient where it did not "discuss{} subject import volume in relation to its findings with respect to the conditions of competition."). The Court in *OCP I* therefore articulated the principle that "imported volumes may not be significant if the imported quantities fill demand that the

37

domestic industry is unable to meet 'either because of incapability or lack of viability.'" *OCP I*, 658 F.Supp. at 1320 (quoting *Altx*, 26 C.I.T. at 717). Thus, where the product under investigation is "practically unavailable from U.S. sources," this Court has found that "the Commission must ensure that any determination of significant volume takes account of these conditions." *Id.*

Here, the Commission's volume analysis was entirely devoid of any mention that the volume of shrimp needed to supply U.S. demand is "practically unavailable from U.S. sources." *Id.* at 1313. Several of SEAI's submissions discussed why this factor should frame the Commission's volume analysis, and at minimum should be addressed in this context. SEAI Prehearing Brief, Appx044341-044345, SEAI Posthearing Brief, Appx045751-045753; SEAI Final Comments, Appx054907-054912; Hearing Transcript, Appx058428-058438. Instead, the Commission's brief volume analysis simply concluded "that the volume of cumulated subject imports is significant in absolute terms and relative to production and consumption in the United States, and that the increase in subject imports relative to production and consumption in the United States is also significant." Views,

38

Appx001316. The Commission's one-page analysis only cited various statistics on the record regarding the volume, market share, and ratio to domestic industry production of subject imports. *Id.*, Appx001315.

As discussed above, evidence of domestic supply constraints and the lack of responsive of domestic landings to various market conditions is a key condition of competition under the statute which must be considered in the Commission's volume analysis. As such, in the underlying investigation, SEAI detailed why the ION Report and the domestic industry's supply constraints show volumes of subject imports are not injurious to the domestic industry. Specifically, as described above, SEAI explained "that persisting constraints on U.S. producers' supply, namely fixed domestic landings, have necessarily led to relatively fixed U.S. production quantities regardless of subject import volumes." SEAI Prehearing Brief, Appx044340. As explained, this central feature of the domestic industry has meant that U.S. processors cannot supply any significant portion of U.S. demand. *Id.*, Appx044341. The ION Report, domestic landings data dating back to 2001, and the Commission's Final Report confirm that U.S. producers simply cannot fulfill the vast majority of U.S. consumption. The ION Report also

39

concludes, based on this data and its economic regression analysis, that "there is no statistically significant relationship" between import volumes and domestic landings, and that "the level of domestic landings has not been suppressed by the volume of imports." SEAI Prehearing Brief, Appx044342, Appx044418. In essence, this data and analysis show that the supply of raw materials available to U.S. processors is fixed by factors entirely unrelated to subject imports, and that subject import volumes are not injurious to the U.S. industry.

Despite this record evidence and the ION Report's conclusion that subject import volumes have no impact on domestic landings, the Commission's volume analysis did not account for the fact that U.S. supply constraints limit domestic production, creating a large gap between the upper limit of what domestic producers can supply the market, and total U.S. demand. To quantify this gap, record evidence showed that during the POI, even if 100 percent of U.S. Gulf landings could be processed and sold by U.S. processors (which is not practically achievable), these landings could have at most fulfilled 6.02 percent of U.S. demand throughout the full calendar years of the POI (2021-2023). SEAI Prehearing Brief, Appx044343. This significant constraint on

40

domestic supply explains why import volumes overall account for over 90 percent of U.S. consumption during all periods during the POI, and also shows that the inability of U.S. processors to increase their production or grow market share is due to supply constraints, not subject import volumes. As a result, while the Commission recited statistics regarding the domestic industry's market share relative to imports, it did not provide any context whatsoever for these figures. Commission Views, Appx001307-001308.

While the Commission is not required to "lay out its analysis in some prescribed way," there is simply no mention of the impact of U.S. supply constraints with respect to volume anywhere in the Commission's *Final Determination*. *Hynix Semiconductor, Inc. v. United States*, 431 F.Supp.2d 1302, 1314 (Ct. Int'l Trade 2006). However, the Commission's omission of this condition of competition from its volume analysis and lack of consideration of significant record evidence in this context is contrary to law and unsupported by substantial evidence.

Just as the Commission must frame its volume analysis with respect to conditions of competition, it must also frame its price effects analysis. The ION Report's conclusions, as well as other record evidence showing

41

the extent of U.S. supply constraints, must also be adequately considered in the Commission's price effects analysis. However, to avoid duplication, SEAI refers the Court to the Indonesian and Vietnamese Respondents' separate joint motion for judgment on the agency record and accompanying memorandum, which more thoroughly addresses the Commission's finding that the import prices injure the domestic industry. SEAI supports this analysis and incorporates it by reference.

B. <u>The Commission's Finding that Cooked Shrimp Is Not a Separate Like Product is Unsupported By Substantial Evidence and Not in Accordance With Law</u>

In conducting its injury analysis, the Commission must first define the "domestic like product" and the industry at issue. The statute defines the relevant industry as the "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A). The statute goes on to define the "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(1).

42

While the text of the statute instructs the Commission to begin its analysis with reference to the product that is "subject to an investigation" (*i.e.*, included within the scope as defined by the petition and Commerce's investigation), the Commission is not strictly bound by Commerce's scope determinations. *See e.g., Torrington Co. v United States*, 747 F. Supp. 744 (Ct. Int'l Trade 1990), *aff'd* 938 F.2d 1278 (Fed.Cir. 1991). Indeed, in a prior investigation involving shrimp, the Commission found there to be two like products (canned shrimp versus frozen shrimp), despite both products being subject to Commerce's investigation. *See Certain Frozen or Canned Warmwater Shrimp and Pawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-68 (Final), USITC Pub. 3748 (Jan. 2005) at 8-10.

The like product analysis is necessarily fact-intensive and the Commission looks for "clear dividing line{s}" between types of product to identify whether there are separate domestic like products. *See Nippon Steel Corp. v. United States*, 19 C.I.T. 450, 455 (Ct. Int'l Trade 1995) (the ITC "disregards minor differences, and looks for clear dividing lines between like products"). The Commission typically, as it did in this case, considers the following six factors when analyzing whether certain

43

products are "like": (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) market perceptions of the products; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price. *Id.* at 455, n.4. However, in this case, the Commission overlooked evidence confirming a clear dividing line between cooked and raw frozen shrimp.

In this case, the Commission went through its standard six-factor analysis and concluded that frozen raw and frozen cooked shrimp constituted a single like product. Views, Appx001278- 001284. In reaching this conclusion, the Commission focused on what it saw as "substantial similarities between frozen cooked shrimp and frozen raw shrimp in terms of physical characteristics and uses," *Id.*, Appx001282, but did not adequately consider the record evidence showing that channels of trade, purchaser perceptions, and production equipment and methods are substantially different between the raw and cooked shrimp.

As an initial matter, the fact that there may be "substantial similarities" between cooked and raw shrimp characteristics takes an

44

overly simplistic view – of course both cooked and raw shrimp are shrimp, and both are intended for the same ultimate use, human consumption. However, cooked and raw shrimp are not interchangeable where the point of sale from producer to the market takes place. As highlighted in SEAI's Prehearing Brief, 15 out of 20 responding purchasers indicated that raw and cooked shrimp were never interchangeable. SEAI Prehearing Brief, Appx044312, Staff Report Appx001042. That is, a purchaser of shrimp from a shrimp producer requires one or another, either raw or cooked; the restaurant industry purchases raw shrimp to cook, and while a grocery store stocks both to meet customer demands it purchases raw and cooked shrimp independently to satisfy the two segments of end consumer demand. SEAI Prehearing Brief, Appx044312-044313. Within the grocery segment, the products are marketed distinctly, with advertisements for cooked shrimp highlighting that the shrimp are ready to eat. SEAI Pre-Hearing Brief Appx044314, Appx044369-044385 (including a product advertisement indicating that the cooked shrimp product was "great for tacos, pasta, salads, or just snacking. They're pre-cooked, peeled, and deveined to help save you time in the kitchen."). Yet, the Commission

45

concluded that "processors and retailers market frozen cooked shrimp and frozen raw shrimp as if they were interchangeable." Views, Appx001282. The Commission cited no evidence that "processors" market cooked and raw as interchangeable, and, even if raw and cooked frozen shrimp are all sold in similar packaging, they are marketed as a different product in retail packaging.

The record also establishes that the cooking equipment and process is significant. Here, the Commission downplayed the capital- and regulatory-intensive nature of shrimp cooking at scale, instead characterizing the cooking production process as a mere "additional step" before freezing. *Id.*, Appx001281. The Commission went on to cite some of the cooking equipment and approval, but does not appear to have assigned any weight to the evidence. *Id.*, Appx001282. There the Commission stated that "{t}here is also evidence that dedicated equipment, FDA approval, and adherence to hygiene protocols may be necessary to produce and sell frozen cooked shrimp." *Id.* However, the Commission appears to have drawn no conclusion on this point, instead demurring that "the record was unclear" regarding whether "U.S. producers of frozen cooked shrimp have been producing such shrimp in

46

the same facility with the same employees used to produce frozen raw shrimp." *Id.*

The Commission's myopic focus on this question–whether the U.S. production of frozen cooked shrimp within the same facility and same employees – overlooked significant record evidence on these points. First, this line of analysis completely ignores the significant equipment and investment necessary to process cooked shrimp at commercial scale. Indeed, U.S. processors indicated that the investment necessary to produce cooked shrimp was between **[ # ]** and **[     #     ]** dollars, equivalent to a significant portion of the annual capital expenditure of the top U.S. processors. *See* SEAI Prehearing Brief at 8, Appx044315 (citing the Staff Report at Table III-13 and Table VI-4, Appx001074, Appx001164). SEAI also highlighted FDA requirements (at 21 C.F.R. 123.6(b)(2)), and the need for dedicated equipment. SEAI Prehearing Brief, Appx044316. Regarding dedicated equipment, SEAI highlighted that it was not just a boiler to cook the shrimp, but essentially an entire additional production line was required to manage cross-contamination and different freezing and glazing needs of raw and cooked shrimp. Id., Appx044316-044317. That is, it is not as though the cooking process is

47

merely an "additional step" in the process as the Commission concluded. Views, Appx001281.

Second, the Commission's focus on whether the "three current" U.S. producers of frozen cooked shrimp produced cooked product in the same facility and with the same employees only serves to highlight the U.S. industry's lack of investment and capacity to produce cooked shrimp. Indeed, 14 out of 20 U.S. processors reported that they do not have equipment to produce cooked shrimp. Staff Report, Appx001073. The record confirms that of these three producers, a single producer accounted for the vast majority of U.S. production. SEAI Prehearing Brief at 6, fn 17, Appx044313 (summarizing the record data). To be clear, the lack of meaningful U.S. production itself confirms that the manufacturing facilities, production processes and employees are different than those for raw shrimp product.

This lack of meaningful production is also highlighted in the Commission's discussion of the price factor. Views, Appx001281. There, the Commission explained that U.S. processors reported sales data for the cooked shrimp product in two quarters of the investigation period,

48

and that such thin comparisons were not "a sufficient or reliable basis on which to compare" the prices. *Id.*

In short, while the Commission's analysis is necessarily fact-driven and the Commission did cite to its normal analysis factors in reaching its like product decision, the Commission's determination is not supported by substantial record evidence because the Commission did not adequately take "into account contradictory evidence or evidence from which conflicting inferences could be drawn" as is required under the substantial evidence standard. *Universal Camera,* 340 U.S. at 487-488. Accordingly, the Court should remand the Commission's like product determination so that it can properly take into account the significant differences in cooked and raw shrimp in terms of interchangeability, market perceptions, manufacturing facilities, production processes, and production employees. On this basis, the Commission should conclude that there are two distinct like products – cooked frozen and raw frozen shrimp – and conduct two separate injury analyses.

Finally, as noted above, the Commission previously determined that canned and frozen shrimp constitute a distinct like product in a 2004

49

investigation of frozen and canned warmwater shrimp. The Commission addressed this prior determination at length in footnotes at page 21 of its Views. *See* Views at 21, fn 57 and 58, Appx001283. While the Commission's determination in that case is not controlling here, the Commission's analysis is nonetheless instructive. There, a single U.S. producer made canned shrimp. *Certain Frozen or Canned Warmwater Shrimp and Pawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-68 (Final), USITC Pub. 3748 (Jan. 2005) at 10. Likewise, here few U.S. producers have cooking capacity, with **[      #                 ]** accounting for the vast majority of production. While count size and packaging are similar between cooked and frozen shrimp, cooked frozen shrimp offer home consumers many of the same advantages as canned shrimp in terms of ease of use and preparation. While there are differences in the two cases and the prior decision is not controlling here, many of the same considerations the Commission examined in that case support the conclusion that cooked shrimp is a separate like product in this investigation.

## VII.  <u>Conclusion</u>

For the reasons explained above, SEAI respectfully requests that this

Court enter judgment on the agency record in its favor.

51

## CERTIFICATE OF COMPLIANCE WITH CHAMBER PROCEDURE 2(B)(1)

Pursuant to this Court's Order dated June 5, 2025 (ECF No. 31), setting the word limitation to the Rule 56.2 Motion for Judgment on the Agency Record and accompanying Memorandum in Support of Plaintiff SEAI to 10,000 words, counsel for Plaintiff certifies that the attached Memorandum in Support of Rule 56.2 Motion for Judgment On the Agency Record contains 9,290 words, including footnotes. The word count certification is made in reliance on the word-count function of the word-processing system used to prepared this brief. This brief therefore complies with the Court's Scheduling Order.

By:                                             /s/ Henry D. Almond
                                                Henry D. Almond

**Date: August 22, 2025**

## CERTIFICATE OF COMPLIANCE WITH FEDERAL CIRCUIT RULE 25.1(e)(2)

Pursuant to the Court's guidelines regarding "Document Formatting and ECF Filing" (revised dated August 12, 2025), setting the word limitation for words (inclusive of numbers) marked as confidential at a maximum of 50 words in cases arising under 28 U.S.C. § 1581(c), counsel for Plaintiff certifies that the attached Memorandum in Support of Rule 56.2 Motion for Judgment On the Agency Record contains 8 words marked as confidential, including numbers. This brief therefore complies with the requirements of Federal Circuit Rules 25.1(d) and (e)(2).

By:                                              /s/ Henry D. Almond
                                                 Henry D. Almond

**Date: May 19, 2026**