**Slip Op. 26-106**

**UNITED STATES**
**COURT OF INTERNATIONAL TRADE**

**Court No. 25-00031**

SEAFOOD EXPORTERS ASSOCIATION OF INDIA,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

AD HOC SHRIMP TRADE ACTION COMMITTEE
and
AMERICAN SHRIMP PROCESSORS
ASSOCIATION,

*Defendant-Intervenor*.

Before: M. Miller Baker, Judge

**OPINION**

[Sustaining the International Trade Commission's affirmative material-injury determination.]

Dated: September 4, 2026

*Henry D. Almond*, *J. David Park*, *Lynn M. Fischer Fox*, *Kang Woo Lee*, and *Archana Rao P. Vasa*, Arnold & Porter Kaye Scholer LLP, Washington, DC, on the briefs for Plaintiff.

*Margaret D. Macdonald*, General Counsel; *Karl von Schriltz*, Assistant General Counsel for Litigation; and *John D. Henderson*, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, Washington, DC, on the brief for Defendant.

*Nathaniel Maandig Rickard*, *Zachary J. Walker*, and *Anjelika D. Jani*, Picard Kentz & Rowe LLP, Washington, DC, on the brief for Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

*Roger B. Schagrin*, *Elizabeth J. Drake*, and *Nicholas C. Phillips*, Schagrin Associates, Washington, DC, on the brief for Defendant-Intervenor American Shrimp Processors Association.

*Baker*, Judge: An Indian seafood exporters association challenges the International Trade Commission's finding that domestic shrimp business suffered material injury from cheap imports subsidized by foreign governments. The group argues that the agency incorrectly defined the "domestic like product" to include frozen cooked shrimp, rather than just the raw variety. It also contends that the imports fill a "supply gap" that the domestic industry cannot serve, such that there can be no harm. For the reasons explained below, the court sustains the Commission's determination.

I

To combat unfair trade practices, the Tariff Act of 1930, as amended, provides a mechanism for imposing remedial countervailing duties on imported merchandise subsidized by foreign governments. 19 U.S.C.

§ 1671(a). In that process, the Department of Commerce defines the foreign goods, "the subject merchandise," that it investigates. *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 714 (Fed. Cir. 2020).

The Commission then has the task of determining whether American producers of a "domestic like product" suffer material injury because of those imported goods. That term refers to "a U.S. product which is like, or . . . most similar in characteristics and uses[,] to the subject merchandise." *Id.* (cleaned up).

Thus, the two agencies' respective definitions of "subject merchandise" and "domestic like product" are "critical because they define both the scope of the investigations and the scope of any resulting trade relief, such as the assessment of . . . duties." *Full Member Subgrp. of Am. Inst. of Steel Constr., LLC v. United States*, 81 F.4th 1242, 1249 n.1 (Fed. Cir. 2023) (citation omitted).

The statute instructs the Commission to use Commerce's definition of "subject merchandise" as the starting point for determining what the "domestic like product" is. The former agency "then conducts a six-factor inquiry that evaluates whether the subject merchandise corresponds with a single domestic like product or" multiple ones. *Hitachi*, 949 F.3d at 715.

The six factors are "(1) physical characteristics and uses; (2) channels of distribution; (3) interchangeability; (4) customer and producer perceptions; (5) common manufacturing facilities, production processes, and production employees; and where appropriate

(6) pricing." *Id.* The Commission applies them on a case-by-case basis and no single one is dispositive. *Jeld-Wen, Inc. v. United States*, 567 F. Supp. 3d 1344, 1350 n.2 (CIT 2022).

Once the agency defines the domestic like product, it must determine whether the subject imports caused "material injury" to the relevant industry. This term "means harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A).

For that inquiry, the statute directs the Commission to consider the volume of imports of subject merchandise; the effect those imports have on U.S. pricing for domestic like products; and the impact of such imports on U.S. producers of domestic like products. *Id.* § 1677(7)(B)(i)(I)–(III). For each of those three factors, the statute enumerates corresponding criteria the agency must also examine. *Id.* § 1677(7)(C)(i)–(iii).

II

This is one of a trilogy of cases in which foreign plaintiffs challenge the Commission's finding that subsidized imports from Ecuador, India, and Vietnam materially injured the domestic shrimp industry. *See* 89 Fed. Reg. 102,163, Appx001354. The period of investigation was January 1, 2021, to March 31, 2024. *Id.*

Two aspects of the agency's decision are relevant here: First, its definition of the domestic like product. Second, its rejection of the contention that imports filled a "supply gap" that U.S. fishermen could not satisfy.

A

The Commission stated that its first task was to define the domestic like product and, relatedly, the relevant industry. Appx001268. It acknowledged that it must accept Commerce's definition of "subject merchandise" (the imports under investigation) without modification. Appx001269 & n.11. Even so, it observed that description does not control the Commission's like-product determination. Appx001268 & nn.11–13 (citing cases).

Here, Commerce's definition of the subject merchandise was lengthy. *See* Appx001270–001272 (quoting 89 Fed. Reg. 85,498, 85,499–500). Suffice it to say that the Department's investigation covered frozen warmwater shrimp, both wild-caught and farmed, and both cooked and raw. Appx001270–001271.

The domestic industry groups and the Indian exporters disagreed over whether the Commission's domestic like product should include frozen cooked shrimp. Appx001273. The former advocated treating all frozen shrimp—cooked or raw—as a single domestic like product, while the latter favored defining cooked shrimp as something separate from raw. *Id.*

After reciting the parties' arguments, the agency defined a single domestic like product that included the cooked variety. Appx001277. It considered the six factors as follows:

- As to *physical characteristics and uses*, it found that all in-scope frozen shrimp have similar physical characteristics, even if they are cooked, and have

"the same predominant end use," i.e., they are food. Appx001278. "Although frozen cooked shrimp is sold already cooked and ready to eat (once thawed), as Indian Respondents emphasize, this does not establish a significant difference in physical characteristics or end uses from frozen raw shrimp." Appx001278–001279.

- For *manufacturing facilities, production processes, and employees*, the Commission stated that the record showed a substantial overlap in the production processes for raw and cooked shrimp because they both undergo "the same initial processing steps." Appx001279. But it found that production of cooked shrimp requires expensive specialized equipment, and it noted the Indian exporters' evidence that cooked-shrimp producers need FDA approval and must adhere to strict hygiene standards. *Id.* The domestic industry, meanwhile, contended that some U.S. producers could prepare both cooked and raw frozen shrimp at the same facilities. Appx001279–001280.

- The Commission said the record lacked specific evidence about *channels of distribution*. It noted that while the Indian exporters argued that cooked shrimp's sale to retailers and grocery chains was a "distinct" channel, they also admitted that raw shrimp may be sold to the same channel, and the domestic petitioners presented evidence that retailers and major food service distributors carry both types. "Thus, there appears to be some overlap in channels of distribution between cooked shrimp and raw shrimp, and no evidence of a 'distinct'

channel for cooked shrimp that does not include raw shrimp as well." Appx001280.

- The agency cited questionnaire responses from 20 shrimp buyers, 15 of whom stated that raw and cooked shrimp are never *interchangeable*. But it observed that the domestic petitioners argued that other evidence showed some degree of interchangeability because the two varieties "are processed in the same forms and used in the same applications, and are marketed side-by-side by retailers in near-identical packaging." *Id.*

- The agency cited that same evidence about side-by-side marketing and packaging in considering *producer and customer perceptions*. It compared that evidence to the Indian exporters' argument that people view frozen cooked shrimp as "ready to eat" and frozen raw shrimp as "ready to cook." Appx001280–001281.

- Finally, as to *price*, the Indian exporters argued that frozen cooked shrimp commands a higher price than the raw variety, while the domestic petitioners argued otherwise. The Commission found that because the record contained only two quarters' data showing sales of *domestic* frozen cooked shrimp, there was insufficient evidence to allow for a comparison of U.S.-produced cooked and raw frozen shrimp prices. It stated that prices of *imports* "are not relevant to the inquiry of whether a clear dividing line exists between domestically produced" cooked and raw frozen shrimp. Appx001281.

The agency concluded that there was no "clear dividing line" between the cooked and raw shrimp. Appx001282–001283. It found they have the same physical characteristics and end use, and undergo largely the same processing steps before freezing, and the only significant difference is that raw shrimp must be cooked before consumption. Appx001281. It determined that while some U.S. producers made both raw and cooked shrimp, the record was unclear as to whether any of them were also producing both types in the same facilities with the same employees. Appx001282. And while most *purchasers* reported that raw and cooked frozen shrimp are never interchangeable, the Commission found that packaging materials and websites suggest that processors and retailers market them as though they are substitutable. *Id.*

As a result, the agency recognized that there were "some limits to interchangeability between the two," and that producing cooked shrimp requires additional processing and equipment. Appx001283. But it found that as an overall matter, the "substantial similarities" in physical characteristics and uses, coupled with the "overlap" in manufacturing and production, channels of distribution, and producer and customer perception, meant there was no clear dividing line. Appx001282–001283. The result was that the Commission defined a single domestic like product consis-

ting of all frozen shrimp, rather than excluding cooked crustaceans from that definition.[1] Appx001284.

B

The Commission observed that the Indian exporters argued that "biological limits" on domestic wild shrimp mean that imports, and the prices charged for them, cannot cause any injury to the U.S. industry because the home-grown supply is "largely fixed." Appx001340.

The agency determined that any such limit is "undefined" and found it "irrelevant" because there was no evidence that it either constrained supply or prevented an increase in production. *Id.* Indeed, 91.4 percent of fishermen responding to the questionnaire said the availability of shrimp in the Gulf of Mexico and the Atlantic Ocean did not affect supply. Appx001340–001341. The majority of domestic processors likewise reported no problems with availability of raw shrimp. Appx001341.

The Commission found that even if there is a limit on the amount of harvestable shrimp in U.S. waters, the amount the domestic fishermen catch is ultimately determined by "the financial incentives" for them to do so. *Id.* It cited findings from earlier in its analysis that many shrimpers were "reducing their fishing efforts or abandoning them entirely" because competition from lower-priced imports meant the processors were

[1] The agency also included out-of-scope fresh warmwater shrimp within the domestic like product. Appx001287. No party disputes that decision.

paying the fishermen lower amounts, such that it was "no longer viable for many of them to continue." *Id.*

But the Indian exporters relied on an economic analysis—the ION Report—as evidence of a biological limit controlling the domestic supply. The Commission found the report unpersuasive both because it lacked data about the Atlantic harvest and because it had "methodological flaws." Appx001342. The agency also regarded the report's focus on 2012 through June 2024 to be inadequate because imported shrimp dominated the market for that entire period, meaning the report lacked a comparative analysis of supply conditions when imports were less pervasive. Appx001342–001343.

The Commission therefore elected not to rely on the ION Report. Appx001343. It also disagreed with the Indian exporters that "an eventual unknown limit" on harvestable domestic crustaceans "should supersede other record evidence indicating that there was available supply of wild warmwater shrimp throughout the" period of investigation. *Id.* It concluded, again, that the fishermen reduced their output, and limited the number of days on which they fished, because of cheap imports, not because U.S. waters lacked sufficient shrimp. *Id.*

## III

Invoking subject-matter jurisdiction conferred on the court by 28 U.S.C. § 1581(c), the Seafood Exporters Association of India brought this suit under 19 U.S.C.

§ 1516a(a)(2)(B)(i). Two domestic industry groups[2] intervened to support the agency decision. The parties have fully briefed the plaintiffs' Rule 56.2 motion for judgment on the agency record, which is ripe for disposition.

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits the Commission's conclusion:

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if the agency makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have

---

[2] The American Shrimp Processing Association and the Ad Hoc Shrimp Trade Action Committee.

been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The court also reviews to ensure the agency engaged in "reasoned decisionmaking," meaning its result must be "within the scope" of its authority and "the process" it uses to reach that outcome "must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). The agency must "examine the relevant data and articulate a satisfactory explanation . . . including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). But courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

## IV

### A

The Indian exporters acknowledge that in defining the domestic like product, the Commission followed its practice of looking to the six factors discussed above. ECF 64, at 43–44. Even so, they contend that it "overlooked evidence confirming a clear dividing line between cooked and raw frozen shrimp." *Id.* at 44. In so arguing, the plaintiffs accuse the agency of "not *adequately* consider[ing] the record evidence showing that channels of trade, purchaser perceptions, and production equipment and methods are substantially different between the cooked and raw shrimp." *Id.* at 44 (emphasis added).

To the extent the exporters' charge that the Commission inadequately reviewed the record invites the court to reweigh that material, that argument fails. The court, of course, does not second-guess the Commission's factual findings. *See, e.g.*, *OCP S.A. v. United States*, Slip Op. 26-75, at 10, 2026 WL 2269141, at *3 (CIT 2026). Insofar as the exporters instead contend that substantial evidence would have allowed the Commission to find "a clear dividing line," the question becomes whether substantial evidence supported its finding that there was *no* such line. *See Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Slip Op. 24-56, at 37, 2024 WL 2044061, at *13 (CIT 2024) (observing that the substantial-evidence standard of review allows the court to sustain "even if the record also supports a different outcome," as long as the agency justifies its conclusion by citing substantial evidence).

The exporters call the Commission's finding that cooked and raw shrimp share "substantial similarities" an "overly simplistic view." ECF 64, at 44–45. They emphasize that 15 of 20 responding purchasers stated that raw and cooked shrimp are never interchangeable. *Id.* at 45 (citing Appx001042).

The agency, however, acknowledged that point and distinguished it: "Although a majority of purchasers reported that frozen cooked shrimp and frozen raw shrimp were never interchangeable, packaging materials and websites suggest that processors and retailers market [the two types] as if they were interchangeable." Appx001282; *see also* Appx001280 (noting that

15 of 20 purchasers said the types are not interchangeable).

The Indian exporters also object that "[t]he Commission cited no evidence that 'processors' market cooked and raw as interchangeable." ECF 64, at 46. They then argue that it doesn't matter anyway because "they are marketed as a different product in retail packaging." *Id.*

The agency, though, cited the domestic petitioners' evidence that the two types "are processed in the same forms and used in the same applications, and are marketed side-by-side by retailers in near-identical packaging." Appx001280 (citing Appx045302–045303 (petitioners' agency brief), Appx045407–045432 (Exh. 11 to that brief), Appx045434–045435 (Exh. 12)).

The plaintiffs respond that "[s]imilar (yet distinct) packaging and shelf placement do not negate key purchaser testimony that the products are not interchangeable." ECF 50, at 26. But that argument disregards the standard of review. The Commission is entitled to conclude that other evidence in the record *does* "negate" testimony. The plaintiffs ask the court to reweigh the evidence.[3]

Next, the Indian exporters complain that "the Commission appears to have drawn no conclusion" about whether the cooking equipment and process are significant, "instead demurring that 'the record was unclear'

---

[3] Their reply brief makes this plain by arguing that evidence gleaned from questionnaire responses "weighs heavily in a like-product analysis." *Id.*

regarding whether 'U.S. producers of frozen cooked shrimp have been producing such shrimp in the same facility with the same employees used to produce frozen raw shrimp.'" ECF 64, at 46–47 (quoting Appx001282).

But the agency's task was to determine whether there is a "clear dividing line" between the two types of frozen shrimp. *See Cleo Inc. v. United States*, 501 F.3d 1291, 1295 (Fed. Cir. 2007). Finding that "the record was unclear" supports a conclusion of "no clear line."[4] And the case law establishes that the Commission is to *consider* the six "domestic like product" factors. *See Hitachi*, 949 F.3d at 715. When an agency's obligation consists of "considering" something, it complies with its duty by doing just that. The court cannot "ask more of the Commission than required." *Altx, Inc. v. United States*, 370 F.3d 1108, 1123 (Fed. Cir. 2004).

Although the exporters argue that the agency "overlooked significant evidence," the Commission's discussion shows otherwise. For example, the plaintiffs complain that the agency "completely ignore[d] the significant equipment and investment necessary to process cooked shrimp at commercial scale." ECF 64, at 47. But the Commission said that "[t]he record also indicates that specialized cooking equipment is necessary to produce cooked shrimp. The parties agree

---

[4] The exporters' complaint that the Commission found the two quarters' worth of cooked-shrimp sales data on the record to be an inadequate basis for comparing prices, *see* ECF 64, at 48–49 (citing Appx001281), fails for the same reason.

that this equipment is expensive . . . ."[5] Appx001279. And although the exporters seek to dictate what conclusion the agency must draw from evidence about U.S. production capacity and capabilities, *see* ECF 64, at 48 (arguing what the evidence "confirms"), "weighing the evidence is a task for [the Commission], not this court." *Coal. of Am. Mfrs. of Mobile Access Equip. v. United States*, Slip Op. 25-150, at 7, 2025 WL 3555132, at *3 (CIT 2025).

Finally, the Indian plaintiffs cite a 2004 investigation in which the Commission "determined that canned and frozen shrimp constitute a distinct like product." ECF 64, at 49–50 (citing *Certain Frozen or Canned Warmwater Shrimp and Prawns from Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063 to -68, USITC Pub. 3748 (Jan. 2005) (*Warmwater Shrimp and Prawns*)). They admit that this decision is not controlling, but they call it "instructive" and argue that "many of the same considerations the Commission examined in that case support the conclusion that cooked shrimp is a separate like product in this investigation." *Id.* at 50.

The agency distinguished *Warmwater Shrimp and Prawns*. It observed that canned shrimp in that proceeding exhibited "several clear" differences from the

---

[5] Both the Indian exporters and the Commission treat the estimated expense as confidential. While the court is skeptical of that view, the exact figure is unimportant here. The figures cited in the plaintiffs' confidential brief, ECF 63, at 47, reflect the same dollar range as the sealed version of the agency's decision, Appx001279, which means they both addressed the same cost evidence.

frozen variety. Appx001283 n.58. Among other things, it was prepared by a single U.S. company that did not produce frozen shrimp, and was used for different purposes, such that there was a "clear dividing line." *Id*. The Commission observed that here, both types of shrimp at issue are frozen, are used for the same purposes, and are made by the same U.S. producers in at least some instances. *Id.* It thus provided a reasonable explanation for not following its prior determination.

B

The Indian exporters assert that "[s]upply constraints . . . sever the causal link between subject imports and any injury to the domestic industry." ECF 64, at 16. They characterize this limitation as a "key 'condition of competition'" and acknowledge that the agency considered it in connection with "the adverse *impact* of imports on domestic industry." *Id.* (emphasis added) (quoting 19 U.S.C. § 1677(7)(C)(iii)). But they contend that the Commission should also have examined it for purposes of its volume and price analysis. *Id*.

This argument veers off statutory course. Each of § 1677(7)(C)'s first three clauses corresponds to one of the tripartite factors enumerated in § 1677(7)(B)(i): volume of imports, *see id.* § 1677(7)(B)(i)(I); effects of imports on U.S. prices, *see id.* § 1677(7)(B)(i)(II); and the impact of imports on domestic producers, *see id.* § 1677(7)(B)(i)(III).

Subparagraph (C)'s clause (i) identifies the criteria that must be considered "[i]n evaluating the *volume* of

imports." *Id.* § 1677(7)(C)(i) (emphasis added).[6] Clause (ii) does the same for the agency's "evaluation of the effect of imports . . . on *prices*." *Id.* § 1677(7)(C)(ii) (emphasis added). And clause (iii) is correspondingly limited to the Commission's examination of "the *impact* required to be considered under subparagraph (B)(i)(III)." *Id.* § 1677(7)(C)(iii) (emphasis added).

Clause (iii) further directs that the agency "shall evaluate all relevant economic factors *described in this clause*[7] within the context of the business cycle and *conditions of competition* that are distinctive to the

---

[6] "Congress ordinarily adheres to a hierarchical scheme in subdividing statutory sections." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004). Both the House of Representatives and the Senate follow drafting manuals directing that sections be divided into subsections denoted with lowercase letters ((a), (b), etc.), paragraphs designated with Arabic numerals ((1), (2), etc.), subparagraphs that use uppercase letters ((A), (B), etc.), and clauses indicated with lowercase Roman numerals ((i), (ii), etc.). *Id.* at 60–61 (citing House Legislative Counsel's Manual on Drafting Style, HLC No. 104–1, at 24 (1995), and Senate Office of the Legislative Counsel, Legislative Drafting Manual 10 (1997)). Here, that means 1677 is the section, (7) is the paragraph, (C) is the subparagraph, and (i) is the clause.

[7] In what might be characterized as the "ellipsis dixit" canon of construction, the Indian exporters substitute an ellipsis for the words "described in this clause" when quoting § 1677(7)(C)(iii). *See* ECF 64, at 17. Making this omission even more egregious, their citation to § 1677(7)(C) misleadingly leaves out clause (iii), *see id.*, thereby implying that the phrase "conditions of competition" applies to the entirety of subparagraph (C) rather than just clause (iii). Such pettifoggery is less than helpful to the court.

affected industry." 19 U.S.C. § 1677(7)(C)(iii) (emphasis added). Thus, clause (iii) requires the Commission to take the "conditions of competition" into account only for purposes of its evaluation of the "relevant economic factors," which in turn inform only the agency's examination of "the *impact* required to be considered under subparagraph (B)(i)(III)." *Id.* (emphasis added).

In short, the Commission committed no legal error by limiting its consideration of the "conditions of competition," including supply, to its examination of "the impact" of foreign shrimp on U.S. industry "under subparagraph (B)(i)(III)." *Id.* § 1677(7)(C)(iii). The question, then, is whether the result of that examination is supported by substantial evidence.

The agency identified "supply considerations" as a "condition of competition" that "inform[ed its] analysis" of material injury. Appx001303–001304. It found that U.S. processors were not using all their practical capacity during the period of investigation and that most of them reported that they did not experience any supply constraints during the relevant period. Appx001305. A few, however, did state that the fresh shrimp supply had declined due to low shrimp prices and high input costs. Appx001306. A majority still agreed that the availability of wild-caught fresh shrimp did not constrain their operations. Appx001307. And the agency found that any decline in the domestic wild-caught supply was caused not by biological limitations but by fishermen cutting back their operations in response to declining prices caused by cheap imports. Appx001341.

But, as explained above, the Indian exporters respond that the Commission improperly found that a report—the ION Report—on which they relied was "irrelevant." ECF 64, at 29 (citing Appx001340). They call the agency's conclusion arbitrary, *id.*, while acknowledging that the report "does not quantify the actual biological limit of shrimp available in U.S. waters," *id.* at 30. They contend that the ION Report establishes that the domestic industry's growth was hampered by the fishermen's inability to increase their catch, rather than by imports. *Id.* at 32.

The Commission, again as noted above, explained that it found the ION Report's "limitations" sufficient reason not to rely on it. Appx001342–001343. The Indian exporters now respond that those limitations "do not undermine" the report's conclusions and "do not render the structural supply evidence irrelevant to the Commission's statutory analysis." ECF 50, at 15. But those are questions for the agency, not this court, to decide. *Cf. Taizhou United Imp. & Exp. Co. v. United States*, 570 F. Supp. 3d 1358, 1364 (CIT 2022) (quoting Commerce's observation that it is the agency's prerogative, not the respondent's, to determine what information is relevant). The plaintiffs give the game away when they argue that "even if the Court were to fully accept each methodological criticism, those critiques would go only to the weight of the econometric modeling" and "would not render irrelevant" other data in the report. ECF 50, at 17.

The exporters also take issue with the Commission's finding that the ION Report was inadequate because it did not "perform any multiple regression

analyses to control for the many factors simultaneously affecting the independent and dependent variables (*e.g.* diesel prices)." Appx001342. They complain that "it did not perform or identify any competing empirical analysis or articulate why a simple regression analysis was unreliable or inaccurate." ECF 50, at 16 (citing Appx001342–001343).

The agency, though, reasonably explained that the simple analysis tested "the relationship between a single independent variable (*e.g.*, ex-vessel prices), and the dependent variable (*e.g.*, domestic landings)." Appx001342. It termed that a "methodological flaw[ ]" compared to a multiple regression analysis. *Id.* The Commission plainly viewed the latter as superior, and it was its prerogative to do so. In addition, it found other flaws in the report. *See* Appx001342–001343.

Finally, the court observes that the Indian plaintiffs' insistence that U.S. fishermen could not satisfy the entirety of domestic demand does not respond to the agency's finding that the latter *reduced* their fishing efforts and *decreased* the volume of shrimp caught. Appx001343. The agency explained that even though the domestic industry could have supplied more shrimp than it did, it still lost market share to the imports, and its performance declined by more than apparent U.S. consumption. Appx001343–001344.

In effect, the Indian exporters try to change the subject by posing a question that the Commission did not consider—whether domestic production could satisfy 100 percent of demand. They do not dispute that the domestic industry lost market share during the

period of investigation—rather, they argue that the agency defined the issue incorrectly. *See* ECF 50, at 11 ("The question is not whether fishermen reduced effort during a period of low ex-vessel pricing. The question is whether domestic production is capable of meeting a substantially greater share of U.S. demand.").

But the statute does not provide any guidance on how the Commission is to determine the relevant "conditions of competition." *See* 19 U.S.C. § 1677(7)(C)(iii). The agency therefore has "discretion to assess" those conditions "in a particular industry." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. United States*, 348 F. Supp. 3d 1328, 1333 (CIT 2018). Here, it provided a reasonable explanation for its finding that imports, rather than supply constraints, injured U.S. shrimp fishermen. That conclusion being supported by substantial evidence, the court sustains it.

* * *

For the foregoing reasons, the court sustains the Commission's material-injury determination. A separate judgment will issue. *See* USCIT R. 58(a).

Dated: September 4, 2026 — New York, NY

/s/ *M. Miller Baker*
Judge